UNITED STATES of America, Appellee,

v.

Mark ROSSETTI, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Ralph ROSSETTI, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Stephen ROSSETTI, Defendant, Appellant.

Nos. 83–1672, 83–1700 and 83–1701.

United States Court of Appeals, First Circuit.

Heard May 7, 1985.
Decided July 19, 1985.

Russell R. Weddell, Boston, Mass., by appointment of the Court, with whom Leppo & Traini, Boston, Mass., was on brief for Mark Rossetti and Ralph Rossetti.

Frank G. Kelleher, Boston, Mass., for Stephen Rossetti.

Paul F. Healy, Jr., Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief for appellee.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and WYZANSKI,[*] Senior District Judge.

LEVIN H. CAMPBELL, Chief Judge.

Defendants Mark, Ralph, and Stephen Rossetti appeal from their convictions in the United States District Court for the District of Massachusetts for conspiring to commit and committing the offense of armed robbery in violation of 18 U.S.C. § 2113.

The Rossettis raise a number of arguments on appeal. First, they claim that the district court erred in denying their motion to dismiss [1] when two witnesses recanted

---

[*] Of the District of Massachusetts, sitting by designation.

[1] In their brief, the Rossettis claim that they moved for a dismissal or a mistrial. However, the transcript indicates that they moved only for a dismissal. The district court specifically asked whether anyone was moving for a mistrial and was informed that no such motion was before the court.

their prior testimony during the trial. Second, they contend that the district court erred in denying their motion to strike the testimony of a key government witness after a government investigator told the witness of inconsistencies between his and other witnesses' testimony and later told him that the inconsistencies had been resolved. Third, the Rossettis argue that the district court should have granted their motion for judgment of acquittal made at the close of all the evidence because the evidence was insufficient to support the verdict. Additionally, Stephen Rossetti submitted a separate brief [2] in which he asserts that he was denied effective assistance of counsel due to his trial counsel's failure to raise the defense of the government's alleged violation of the Interstate Agreement on Detainers Act, 18 U.S.C. App. III.

We find the Rossettis' arguments unpersuasive and affirm the judgment of the district court.

## I.

On April 26, 1982, five individuals robbed a Brink's armored truck at gunpoint after it made a routine deposit pick-up at the First National Bank of Boston's branch in the Northgate Mall in Revere. One of the participants, Alan Delverde, turned state's evidence in exchange for a grant of immunity and implicated defendants Mark, Stephen, and Ralph Rossetti, and two others,[3] in the conspiracy to commit, and the commission of, the robbery.

Delverde was the key government witness at trial, although his testimony was corroborated by other witnesses. At one point, there appeared to be an inconsistency between Delverde's story and the testimony of the two Brink's employees who

were held up. Before trial, Delverde claimed that he and his accomplices had held up the Brink's messenger on his sole trip from the bank to the truck. The Brink's messenger, Victor Morad, and the Brink's driver, Edward Novi, claimed that the robbery occurred after Morad's second trip to the truck.

After Morad and Novi testified but before Delverde took the stand, the police officer who had conducted most of the government's investigation into the robbery, Sgt. McLaughlin, asked Delverde how he knew that the messenger would come out of the bank a second time. Delverde responded that he had only come out once. Sgt. McLaughlin then told Delverde that the Brink's employees had testified that the messenger had made two trips.

After Delverde took the stand and testified on direct examination that they had robbed the truck as the messenger made his only trip from the bank, the two Brink's employees admitted to the United States Attorney that they had lied and that Delverde's story was correct. They explained that they had lied to protect Morad's job, which could have been endangered if Brink's found out that Morad had broken company policy by carrying so much money out of the bank at one time. During a break in the defense's cross-examination of Delverde, McLaughlin told Delverde that the issue had been resolved, to which Delverde responded, "I was only going to testify once, because that's the way it was."

The United States Attorney immediately informed the court of the perjured testimony. The court held a voir dire, at which the Rossettis moved for a dismissal. They argued that this change in the case greatly prejudiced the defense because it suddenly deprived them of a means of impeaching a

---

**2.** On January 29, 1985, Stephen Rossetti's lawyer, William Cintolo, filed a motion on Rossetti's behalf requesting leave to join the issues raised in Mark Rossetti's brief. The court allowed the request and oral argument was had on May 7, 1985. At argument, Stephen Rossetti's new counsel, Frank G. Kelleher, requested leave to file a supplemental brief, which request was granted.

**3.** The two others Delverde implicated in the robbery were John Jozapaitis, who was killed in an accident in 1981, and Richard Devlin, who was tried with the Rossettis and acquitted of both charges.

crucial government witness that they had relied upon in building and presenting their case. The court listened to examination of Morad and Novi. McLaughlin was also called to the stand and his contacts with Delverde were made known to the court. The Rossettis then moved to strike Delverde's testimony because of his allegedly improper contacts with McLaughlin. At the close of the hearing, the court denied both of the Rossettis' motions and the trial resumed.

Novi and Morad were recalled by the government and testified before the jury that only one trip had been made. Both were cross-examined, and the court informed the Rossettis that they could call or recall any witness they desired concerning the number of trips the messenger made. McLaughlin also testified and was questioned about his conversations with Delverde regarding the number of trips the messenger made.

At the close of the government's case, and again at the close of all the evidence, the Rossettis moved for judgments of acquittal on both counts of the indictment. The motions were denied, and the jury found the Rossettis guilty on both counts. The court sentenced Mark and Stephen Rossetti to five years imprisonment on the conspiracy count and ten years imprisonment on the substantive count, the sentences to be served concurrently. Ralph Rossetti was sentenced to concurrent terms of five years on the conspiracy count and seven years on the substantive count. These appeals followed.

## II.

We consider first the Rossettis' contention that the district court erred in refusing to dismiss when the Brink's employees admitted to having given perjured testimony. We believe the district court ruled correctly.

We recently addressed a similar problem in *United States v. Arruda,* 715 F.2d 671 (1st Cir.1983), in which two witnesses violated the court's sequestration order by meeting during trial to discuss testimony and one of those witnesses allegedly perjured himself by lying about the frequency and substance of the improper conversations. In *Arruda,* we concluded that "[w]here there is no evidence that the government acted in bad faith or intentionally attempted to introduce false testimony, and the perjury is fully exposed to the jury, it is not error to deny a motion for a mistrial." *Id.* at 684. *See also United States v. Burreson,* 643 F.2d 1344, 1350 (9th Cir.), *cert. denied,* 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981); *Braxton v. Estelle,* 641 F.2d 392, 395 (5th Cir.1981).

There is no evidence that the United States introduced Novi and Morad's testimony in bad faith, knowing that they were lying. The government had no reason to do so, as it was immaterial to the prosecution's case whether the messenger had made one trip or two. At most the prosecution was aware that there was an inconsistency as to this point in the various witnesses' testimony. This minor inconsistency did not go to an element of the crime or to a defense to it, and it easily could be seen as the product of memory lapses. The prosecution's failure to pursue this, then, does not indicate bad faith on its part.

We do not say that if the Rossettis had shown some measure of governmental bad faith a mistrial or dismissal would automatically follow. Depending on the seriousness of the government's misconduct, a showing of actual prejudice could be required before a court could order a mistrial or dismissal. *Cf. United States v. Bagley,* —— U.S. ——, 105 S.Ct. 3375, 3381–84, —— L.Ed.2d —— (1985); *United States v. Hemmer,* 729 F.2d 10, 13 (1st Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984) (to succeed on a claimed violation of Fed.R.Crim.P. 16, defendant must demonstrate government's violation of discovery rule actually prejudiced his defense; here, no prejudice "sufficient to warrant the extraordinary relief of dismissal"); *United States v. Richman,* 600 F.2d 286, 291–92 (1st Cir.1979) (government's violation of Fed.R.Crim.P. 16 not so prejudicial as to

merit dismissal); *United States v. Gladney,* 563 F.2d 491, 494 (1st Cir.1977) ("Violation of Rule 16(a)(1)(A), like the violation of other discovery rules, calls for the application of differing remedies depending upon the seriousness of the violation and the amount of prejudice to the defendant."). We need not decide what, if any, precise balance of bad faith and prejudice need be shown in these circumstances to warrant relief because the Rossettis have entirely failed to prove governmental misconduct.[4]

### III.

■ The Rossettis next contend that the district court's denial of their motion to strike Delverde's testimony was error warranting a new trial. They base this claim on the allegedly improper discussions McLaughlin and Delverde had during the trial regarding inconsistencies between Delverde's and the Brink's employees' testimony. We hold that the district court did not abuse its discretion in denying the Rossettis' motion.

The contacts between McLaughlin and Delverde were not improper. At the time of these conversations, neither the prosecution nor the defense had requested the court to instruct any witness not to discuss his testimony with another potential witness during the trial. Moreover, the court had not of its own motion entered a sequestration order. *See* Fed.R.Evid. 615 ("At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion."). Finally, there is no suggestion that

McLaughlin initiated these brief interchanges for the purpose of inducing Delverde to alter his testimony; rather, it seems that McLaughlin was understandably concerned that someone was committing the crime of perjury, and, commendably, undertook to investigate.

Indeed, even if, as the Rossettis argue, there existed some sort of implicit sequestration rule, "[i]t is well settled that breach of a sequestration order does not automatically disqualify a witness from rendering testimony; the appropriate sanction is left to the sound discretion of the district court." *Arruda,* 715 F.2d at 684. *See also United States v. Cox,* 752 F.2d 741, 748 (1st Cir.1985); *United States v. Ayers,* 725 F.2d 806, 811–12 (1st Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984).

The court clearly committed no abuse of discretion here. McLaughlin's discussion of the apparent inconsistency with Delverde prior to Delverde's taking the stand had no effect on Delverde's testimony. Despite his awareness that others' stories were different than his, Delverde stuck to his pretrial statements. By the time McLaughlin told Delverde that the inconsistency had been resolved in favor of Delverde's version of the events, Delverde had already testified as to his recollection; this confirmation could not be said to have affected his testimony. Nor could the conversations between Delverde and McLaughlin have influenced McLaughlin's testimony, as he could not testify as to the details of an incident he did not witness.

---

4. The Rossettis also failed to demonstrate actual prejudice. All proper procedural steps were taken to ensure that the Rossettis' defense suffered no prejudice as a result of the Brink's employees' change of heart. The perjury was quickly made know to the court and an extensive voir dire was held. The Brink's employees were recalled, re-examined, and re-cross-examined. The defense was permitted to recall any witnesses it felt necessary to call.

Moreover, the Brink's employees' change in testimony did not deprive the defendants of a meritorious defense or enable the prosecution to establish an element of the crime; it served

only to deprive them of a means of impeaching a government witness on a collateral point. To be sure, the witness was an important one and some alteration in the defense's strategy may have been necessary after the Brink's employees changed their tune. But the point was not important enough to have warranted a mistrial, let alone a dismissal. A continuance may have been appropriate, but none was requested. *Cf. Hemmer,* 729 F.2d at 13–14 (no request for continuance significant in undermining claim of prejudice); *United States v. Gladney,* 563 F.2d 491, 494 (1st Cir.1977) (claim of prejudice undercut by defendant's refusal of continuance).

It is also important that these conversations concerned a factual detail that was relevant only to impeach the credibility of Delverde, not to challenge the government's contention that these defendants committed this robbery. *See* note 4, *supra*. The jury had ample opportunity to draw its own conclusions as to Delverde's and McLaughlin's credibility and any possibility of collusion after the contacts between the two were revealed to the jury and explored by counsel on direct and cross-examination.

Finally, as already noted, it does not appear that McLaughlin was motivated by any but proper motives in talking to Delverde.

In sum, we believe the district court acted well within its discretion in allowing Delverde's testimony to stand.

## IV.

 We find no merit in appellants' argument that there was insufficient evidence to support the guilty verdicts. We have carefully reviewed the record and are satisfied that there was ample evidence for a jury to find both defendants guilty beyond a reasonable doubt. Accordingly, we affirm the district court's denial of their motions for judgment of acquittal.

## V.

Stephen Rossetti raised a final argument based on the Interstate Agreement on Detainers Act ("IADA"), 18 U.S.C.App. III. The IADA "prescribes procedures by which a member State[5] may obtain for trial a prisoner incarcerated in another member jurisdiction and by which the prisoner may demand the speedy disposition of certain charges pending against him in another jurisdiction." *United States v. Mauro*, 436 U.S. 340, 343, 98 S.Ct. 1834, 1838, 56 L.Ed.2d 329 (1978). The procedures are triggered only when a "detainer" is filed with the custodial (sending) State by another (receiving) State having untried charges pending against the prisoner. *Id.*

Stephen Rossetti's claims are founded upon Article III of the IADA.[6] Article III

---

5. Article II(a) defines a "State" for purposes of the IADA as "a State of the United States; the United States of America; a territory or possession of the United States; the District of Columbia; the Commonwealth of Puerto Rico."

6. (a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party State, and whenever during the continuance of the term of imprisonment there is pending in any other party State any untried indictment, information, or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred and eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information, or complaint: *Provided*, That, for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance. The request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decision of the State parole agency relating to the prisoner.

(b) The written notice and request for final disposition referred to in paragraph (a) hereof shall be given or sent by the prisoner to the warden, commissioner of corrections, or other official having custody of him, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court by registered or certified mail, return receipt requested.

(c) The warden, commissioner of corrections, or other official having custody of the prisoner shall promptly inform him of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition of the indictment, information, or complaint on which the detainer is based.

(d) Any request for final disposition made by a prisoner pursuant to paragraph (a) hereof shall operate as a request for final disposition of all untried indictments, informations, or complaints on the basis of which detainers have been lodged against the prisoner from the State to whose prosecuting offical the request for final disposition is specifically directed. The warden, commissioner of corrections, or other official having custody of the

provides that a prisoner against whom a detainer has been filed may demand speedy disposition of the charges pending against him in the jurisdiction that filed the detainer by submitting a written notice and request for final disposition to the warden of the custodial facility. Once such a notice and request has been filed, various rights accrue to the prisoner under Article III. In particular, Article III(d) provides that once the receiving state accepts temporary custody of the prisoner, he must be tried before he can be returned to the custody of the original jurisdiction. Article III(d) also states the penalty for premature return of the prisoner:

> If trial is not had on any indictment, information, or complaint contemplated hereby prior to the return of the prisoner to the original place of imprisonment, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

■ A prisoner who understands his rights under these "anti-shuttling" provisions of Article III can, however, voluntarily waive those rights. *See United States v. Black,* 609 F.2d 1330, 1334 (9th Cir.), *cert. denied,* 449 U.S. 847, 101 S.Ct. 132, 66 L.Ed.2d 56 (1980); *United States v. Eaddy,* 595 F.2d 341, 344 (6th Cir.1979); *United States v. Ford,* 550 F.2d 732, 735, 742 (2nd Cir.), *aff'd,* 436 U.S. 340 (1978); *United States v. Scallion,* 548 F.2d 1168, 1170 (5th Cir.), *cert. denied,* 436 U.S. 943, 98 S.Ct. 2843, 56 L.Ed.2d 784 (1978).

■ Stephen Rossetti claims that he was denied his sixth amendment right to effective assistance of counsel when his defense counsel failed to explore or assert at trial the defense that the United States had violated Article III by returning him to the custody of Massachusetts after a detainer had been filed and temporary custody secured, but before trial on federal charges [7]. Rossetti claims that had his counsel heeded Rossetti's requests to pursue this defense, the result would have been the dismissal of the indictment. Because the facts clearly indicate that Rossetti waived any defense he had under Article III of the IADA, we reject Rossetti's sixth amendment argument.

---

prisoner shall forthwith notify all appropriate prosecuting officers and courts in the several jurisdictions within the State to which the prisoner's request for final disposition is being sent of the proceeding being initiated by the prisoner. Any notification sent pursuant to this paragraph shall be accompanied by copies of the prisoner's written notice, request, and the certificate. If trial is not had on any indictment, information, or complaint contemplated hereby prior to the return of the prisoner to the original place of imprisonment, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

(e) Any request for final disposition made by a prisoner pursuant to paragraph (a) hereof shall also be deemed to be a waiver of extradition with respect to any charge or proceeding contemplated thereby or included therein by reason of paragraph (d) hereof, and a waiver of extradition to the receiving State to serve any sentence there imposed upon him, after completion of his term of imprisonment in the sending State. The request for final disposition shall also constitute a consent by the prisoner to the production of his body in any court where his presence may

be required in order to effectuate the purposes of this agreement and a further consent voluntarily to be returned to the original place of imprisonment in accordance with the provisions of this agreement. Nothing in this paragraph shall prevent the imposition of a concurrent sentence if otherwise permitted by law.

. . . .

7. Rossetti also refers to Article IV of the IADA in his arguments. Article IV(a) provides the procedure by which a prosecutor who · has lodged a detainer against a prisoner in another member state can secure the prisoner's presence for disposition of outstanding charges. Because Rossetti used the procedures made available by Article III (*i.e.,* by requesting speedy disposition of the pending charges), we believe that Article III is the controlling provision. For purposes of analysis, however, it would seem to make little difference which Article applies, as Article IV contains an identically phrased prohibition against return of the prisoner by the receiving state before disposition of the charges it has pending against him and penalty for noncompliance with this prohibition (*i.e.,* dismissal). Article IV(e). Moreover, the waiver analysis is equally apposite in either context. *See, e.g., Eaddy,* 595 F.2d at 344.

**19**

Stephen Rossetti was convicted in a Massachusetts court of conspiracy to assault and rob, and was sentenced to imprisonment of 15–20 years at MCI Walpole. The United States lodged a detainer based on the federal indictment underlying the instant conviction at MCI Walpole against Rossetti on December 27, 1982. On December 31, 1982, Rossetti delivered a notice and request for disposition of the federal indictment with the warden of Walpole pursuant to Article III. The last paragraph of Rossetti's notice and request provided:

Further, pursuant to 18 U.S.C.APPX. ART. III(e) I herby [sic] specifically consent to the preduction [sic] of my "... body in any court where [my] presence may be required in order to effecutuate [sic] the purposes of this [article]."

On January 10, 1983, the federal government accepted temporary custody of Rossetti for the purpose of arraigning him. Rossetti pleaded "not guilty" at his arraignment before United States Magistrate Joyce London Alexander. At the arraignment, the following interchange occurred between Magistrate Alexander, United States Attorney Healy, defense counsel Cintolo, and defendant Rossetti concerning Rossetti's rights under IADA:

THE COURT: Is there an issue of bail?

MR. HEALY: No, your Honor. The defendant is presently held in the State, being convicted.

THE COURT: (Inaudible.)

MR. HEALY: Yes. He sent a letter in, Your Honor, waiving his right under the interstate agreement on detainers. I'd just like the Defendant and his counsel [to state] for the record that they understand that he has a right to be held by the Government, by the United States for the period until he is tried, but in this case I believe he desires to go back to the facility where he is, which is I think Concord, rather than being held by the Federal Government until the time of his trial.

THE COURT: Is that correct, counsel?

MR. CINTOLO: That's correct, Your Honor. I believe the last paragraph of that document—I don't think it [was] mailed, I believe it was hand delivered. The last paragraph of that document indicates that he will waive his right pursuant to the interestate [sic] agreement on detainers.

THE COURT: Is that correct, Mr. Rossetti?

THE DEFENDANT: Yes, it is.

MR. HEALY: We would ask for an unsecured bond of say $10,000, Your Honor.

THE COURT: Okay. Well, in light of your being held, the Court sets bail on this case at $10,000 without surety.

As this dialogue makes clear, Rossetti was informed of his right to remain in the custody of the United States until trial. Apparently desiring to return to Massachusetts' custody to continue serving his state sentence, Rossetti explicitly waived his rights to remain in federal custody. We find this waiver to be an intelligent and voluntary relinquishment of a known right[8] and therefore reject any contention that defense counsel's failure to press an IADA defense deprived Rossetti of effective assistance of counsel.

*Affirmed.*

---

**8.** Because the waiver in this case met the standard set out in *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) ("A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege."), we need not decide whether, as some courts have held, a prisoner may waive his Article III(d) and IV(e) rights, even though he is not aware of those rights, by affirmatively requesting "to be treated in a manner contrary to the procedures prescribed by Article IV(c) or (e) [, or Article III(d), *i.e.,* by requesting to be transferred back to the custody of the sending state prior to trial]." *Eaddy,* 595 F.2d at 344. *See also Black,* 609 F.2d at 1334; *Ford,* 550 F.2d at 742; *Scallion,* 548 F.2d at 1170.