UNITED STATES of America, Appellee,

v.

David SEPULVEDA, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Edgar SEPULVEDA, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Edward W. WELCH, Jr., Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Arline S. WELCH, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Kevin CULLINANE, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Cheryl T. JOHNSON, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Richard F. LABRIE, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Tony ROOD, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

William D. WALLACE, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Ernest F. LANGLOIS, Defendant,
Appellant.

Nos. 92–1362, 92–1574, 92–1364, 92–1366,
92–1367, 92–1369, 92–1371, 92–1373 to
92–1375, 92–1573 and 92–1629.

United States Court of Appeals,
First Circuit.

Heard June 15, 1993.

Decided Dec. 20, 1993.

Stay of Mandate Dissolved Dec. 30, 1993.

David H. Bownes, with whom David H. Bownes, P.C. was on brief, for defendant David Sepulveda.

Julia M. Nye, with whom McKean, Mattson and Latici, P.A. was on brief, for defendant Edgar Sepulveda.

Stephen A. Cherry, with whom Wright & Cherry was on brief, for defendant Edward W. Welch, Jr.

Kevin M. Fitzgerald, with whom Peabody & Brown was on brief, for defendant Arline S. Welch.

Michael J. Ryan, with whom King and Ryan was on brief, for defendant Kevin Cullinane.

Robert P. Woodward for defendant Cheryl T. Johnson.

Mark H. Campbell for defendant Richard Labrie.

Paul J. Garrity on brief for defendant Tony Rood.

Matthew J. Lahey, with whom Murphy, McLaughlin, Hemeon & Lahey, P.A. was on brief, for defendant William D. Wallace.

Julie L. Lesher, with whom Murphy, McLaughlin, Hemeon & Lahey, P.A. was on brief, for defendant Ernest F. Langlois.

John P. Rab for defendant Christopher Driesse (appellant in consolidated appeal).

Paul J. Haley, with whom Scott L. Hood was on brief, for defendant Shane Welch (appellant in consolidated appeal).

Kevin M. Fitzgerald, Kevin M. Leach, McLane, Graf, Raulerson & Middleton, Peabody & Brown and David H. Bownes on omnibus briefs for all appellants.

Terry L. Ollila, Special Assistant United States Attorney, with whom Peter E. Papps, United States Attorney, and Jeffrey S. Cahill, Special Assistant United States Attorney, were on brief, for appellee.

Before SELYA, CYR and BOUDIN, Circuit Judges.

SELYA, Circuit Judge.

These appeals, arising out of the drug-trafficking convictions of a dozen New Hampshire residents, suggest that while two New Hampshire men might once have been a match for Satan, *see* Stephen Vincent Benet, *The Devil and Daniel Webster* (1937), times have changed. The tale follows.

## I. BACKGROUND

During a two-month trial in the district court, the government mined a golconda of evidence. Because it would serve no useful purpose to recount the occasionally ponderous record in book and verse, we offer instead an overview of the evidence, taken in the light most compatible with the guilty verdicts. *See United States v. Ortiz*, 966 F.2d 707, 711 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1005, 122 L.Ed.2d 154 (1993). Further facts will be added as we discuss specific issues.

For almost six years, David Sepulveda conducted an increasingly sophisticated cocaine distribution business in and around Manchester, New Hampshire. Initially, Sepulveda purchased cocaine from a vendor in Nashua, New Hampshire, and transported it to Manchester himself. Over time, Sepulveda expanded his operation, increasing the volume of cocaine and engaging others to handle tasks such as pickup, delivery, and street-level sales.

As his enterprise grew more ambitious, Sepulveda began purchasing cocaine from a source in Lawrence, Massachusetts. Faced with the need to retain control while insulating himself from the prying eyes of law enforcement personnel, Sepulveda's journeys to Lawrence became an elaborate ritual in which he would scrupulously avoid carrying drugs or travelling in the same car with the cocaine that he purchased. On these provisioning trips, Sepulveda was usually accompanied by his brother, Edgar, and a "runner," that is, an individual who would actually transport the cocaine from Lawrence to Manchester.[1] Frequently, one of Sepulveda's distributors or a user in a particular hurry to obtain fresh supplies would join the troupe.

Once the cocaine arrived in Manchester, Sepulveda and his associates packaged it in street-level quantities and distributed it to a series of individuals for resale and personal use. The buyers included, among others, defendants Edward W. Welch, Jr., Arline S. Welch, Shane Welch, Kevin Cullinane, Christopher Driesse, Cheryl T. Johnson, Richard E. Labrie, Tony Rood, and William D. Wallace. David Sepulveda made a practice of directing persons who inquired about purchasing small amounts of cocaine to these same individuals.

Eventually, David Sepulveda's reach exceeded his grasp. A federal grand jury indicted him, along with others, for drug trafficking; and, after trial, a petit jury convicted twelve persons, *viz.*, the Sepulveda brothers, the three Welches, Cullinane, Driesse, Johnson, Labrie, Rood, Wallace, and Langlois, on a charge of conspiracy to possess and distribute cocaine. *See* 21 U.S.C. § 846 (1988). The jury also convicted David Sepulveda on a charge of engaging in a continuing criminal enterprise. *See* 21 U.S.C. § 848 (1988). Twenty-six appeals ensued.

It is no exaggeration to say that the defendants, represented by able counsel, managed to cultivate a profusion of variegated grounds for appeal from the peat of the protracted trial. Because of the sheer bulk and complexity of the proceedings, we issued a special briefing order and then heard oral argument on all twenty-six appeals. We decide today twelve appeals taken by ten defendants (collectively, "the appellants").[2] After sifting

---

1. At various times, defendants Tony Rood and Ernest F. Langlois worked as runners. At other times, Norberto Perez played this role.

2. The appeals taken by defendants Christopher Driesse and Shane Welch following the trial present certain unique issues and those two appeals will be resolved in a separate opinion. In addition, after the original round of appeals had been docketed, all twelve defendants moved to vacate judgment on the basis of newly discovered evidence. The court below denied relief and a fresh battery of appeals ensued. Those twelve late-blooming appeals were argued in tandem

what grains we can locate from the considerable chaff, we conclude that the appellants enjoyed a fair, substantially error-free trial, and that their convictions must stand. In two instances, however, we vacate particular sentences and remand for further proceedings.

## II. SUFFICIENCY OF THE EVIDENCE

 Four appellants claim that the evidence is insufficient, as a matter of law, to support their convictions.[3] Because insufficiency claims are commonplace in criminal appeals, the standard of appellate oversight lends itself to rote recitation. Following a guilty verdict, a reviewing court must scrutinize the record, eschewing credibility judgments and drawing all reasonable inferences in favor of the verdict, to ascertain if a rational jury could have found that the government proved each element of the crime beyond a reasonable doubt. *See United States v. Echeverri,* 982 F.2d 675, 677 (1st Cir.1993); *Ortiz,* 966 F.2d at 711; *United States v. David,* 940 F.2d 722, 730 (1st Cir. 1991) (collecting cases), *cert. denied,* —— U.S. ——, 112 S.Ct. 2301, 119 L.Ed.2d 224 (1992). To sustain a conviction, the court need not conclude that only a guilty verdict appropriately could be reached; it is enough that the finding of guilt draws its essence from a plausible reading of the record. *See Echeverri,* 982 F.2d at 677; *Ortiz,* 966 F.2d at 711.

 Here, the challenged convictions center around a charge of conspiracy to possess and distribute cocaine. To prove a drug conspiracy charge under 21 U.S.C. § 846, the government is obliged to show beyond a reasonable doubt that a conspiracy existed and that a particular defendant agreed to participate in it, intending to commit the underlying substantive offense (here, possession of cocaine with intent to distribute, 21 U.S.C. § 841(a)(1)). *See David,* 940 F.2d at 735; *United States v. Sanchez,* 917 F.2d 607, 610 (1st Cir.1990), *cert. denied,* 499 U.S. 977, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991); *United States v. Rivera–Santiago,* 872 F.2d 1073, 1079 (1st Cir.), *cert. denied,* 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989). There are no particular formalities that attend this showing: the agreement may be express or tacit and may be proved by direct or circumstantial evidence. *See Echeverri,* 982 F.2d at 679; *Rivera–Santiago,* 872 F.2d at 1079. Moreover, in a criminal conspiracy, culpability may be constant though responsibilities are divided; the government does not need to show as a precursor to a finding of guilt that a given defendant took part in all aspects of the conspiracy. *See United States v. Benevides,* 985 F.2d 629, 633 (1st Cir.1993); *United States v. Cruz,* 981 F.2d 613, 617 (1st Cir.1992). Using these guideposts, we find that the quantum of evidence presented against each of the four challengers suffices.

### A. *Arline Welch.*

 Four witnesses provided the bulk of the evidence regarding Arline Welch's role in the conspiracy. Kurt Coriaty testified that he had purchased cocaine from her both in her home and in his, particularly after her husband, Edward Welch, was imprisoned. Coriaty's partner, Kenneth Milne, stated that Arline Welch gave him cocaine at her home and was present when he purchased cocaine from Edward Welch at the Welch residence. While mere presence is not sufficient to ground criminal charges, a defendant's presence at the point of a drug sale, taken in the light of attendant circumstances, can constitute strong evidence of complicity. *See Ortiz,* 966 F.2d at 711–12.

The jury also heard Norberto Perez explain that Arline Welch accompanied David Sepulveda on three buying expeditions to Lawrence, Massachusetts. Perez testified that, in expressing anxiety, she made manifest her awareness of the trips' purpose, voicing statements like: "Let's hurry up and get this cocaine so we can get out of here." Furthermore, Randall Vetrone testified that

with the fourteen earlier appeals and will be disposed of in a third opinion.

**3.** We do not include under this rubric appellants Edgar Sepulveda and Tony Rood, both of whom argue that the government failed to present suffi-

cient evidence to show their participation in the single "master conspiracy" charged in the indictment. Instead, we treat with those claims in Part IX, *infra.*

Arline Welch was present in Edgar Sepulveda's apartment while the Sepulveda brothers packaged and sold cocaine. Appellant's consensual presence in a private home, not her own, while large quantities of drugs were being packaged for resale, possessed evidentiary significance. From this fact, coupled with other contextual detail (much of it inculpatory), the jury reasonably could have inferred that she was a member of the ring. *See Ortiz,* 966 F.2d at 712 (pointing out that criminals rarely seek to expose their felonious activities to innocent outsiders, where such exposure could easily be avoided); *United States v. Batista–Polanco,* 927 F.2d 14, 18–19 (1st Cir.1991) (to like effect).

██ Keeping in mind the maxim that "criminal juries are not expected to ignore what is perfectly obvious," *Echeverri,* 982 F.2d at 679, the testimony of these four witnesses and the reasonable inferences to be drawn therefrom formed a serviceable predicate upon which to rest a conviction for conspiracy to distribute cocaine.[4] Accordingly, the district court did not err in denying Arline Welch's motion for judgment of acquittal.

## B. *Kevin Cullinane.*

██ Daniel Santos, a quondam partner of Cullinane's in the drug distribution trade, testified that Cullinane introduced him to David Sepulveda and that Sepulveda eventually became a principal supplier of cocaine to the Cullinane–Santos partnership. Santos also testified that Cullinane accompanied Sepulveda on provisioning trips, returning to Santos's apartment with fresh supplies of contraband. The ubiquitous Norberto Perez corroborated this relationship, testifying that he had travelled to Lawrence on at least five occasions in the company of Cullinane and the Sepulveda siblings in order to replenish cocaine stores. Perez also recreated a conversation that took place between Cullinane and Sepulveda involving the former's indebtedness to the latter for transactions in cocaine.

The government adduced abundant evidence that Cullinane distributed much of the contraband he acquired. Perez and Santos both described Cullinane's activities as a vendor. John Rice testified that Cullinane delivered cocaine to defendant Christopher Driesse, and that Driesse, in turn, would resell the drugs. Santos confirmed that Cullinane procured these drugs from David Sepulveda and that Sepulveda extended credit to Cullinane. Another witness, David Chase, acknowledged that he had purchased up to eight kilograms of cocaine from Cullinane before concluding that, aphorisms about honor among thieves notwithstanding, Cullinane could not be trusted.[5]

In view of this plenitudinous testimony, the court below appropriately derailed Cullinane's quest for acquittal as a matter of law.

## C. *Ernest Langlois.*

██ David Sepulveda hired Langlois to be both a drug courier and a torpedo. Langlois's resounding success in the latter role—intimidating Sepulveda's debtors and, sometimes, his associates—produced a suffusion of testimony limning Langlois's role in the organization. For instance, David Hill described four occasions on which Langlois used force, or threats of force, to collect debts owed to Sepulveda. Two other witnesses testified that Sepulveda boasted of employing Langlois as a strongarm to collect drug debts. Another witness overheard Langlois crowing about the nature of his employment. And no fewer than six witnesses relayed information from which a rational jury could infer that Langlois "rode shotgun" during drug-buying expeditions.

As this partial summary indicates, the evidence accumulated against Langlois rose well above the level necessary to sustain the jury's verdict.

4. We give short shrift to Welch's argument, echoed at various times by other appellants, that, because some of the government's witnesses anticipated receiving reduced sentences in exchange for cooperation, their testimony should be regarded as inherently unreliable. When an appellate court reviews the sufficiency of the evidence, it must resolve routine credibility questions in favor of the verdict. *See David,* 940 F.2d at 730.

5. When Chase and Cullinane fell out, Chase took his business directly to David Sepulveda.

### D. *Cheryl Johnson.*

 Two witnesses, Santos and Kathy Malone (an undercover police officer), testified that David Sepulveda sent them to Cheryl Johnson when they wanted to buy cocaine. Santos said that he purchased cocaine from Johnson on approximately one hundred occasions, during which transactions Johnson offhandedly revealed the full extent of her copious cocaine inventory. Malone stated that she purchased cocaine from Johnson on three occasions.[6] Perez testified that he, too, bought cocaine from Johnson, delivered cocaine to Johnson at Sepulveda's behest, and accompanied her on at least one buying trip to Lawrence.

Although Johnson argues vehemently that the witnesses against her were inherently unreliable, courts must leave such credibility determinations in the jury's domain. *See David,* 940 F.2d at 730. Here, the jury was at liberty to credit the testimony, and it, in turn, supplied all the elements necessary to convict.

### III. SEQUESTRATION

Appellants claim that, shortly after sentencing, they learned for the first time that the government housed three key witnesses (Perez, Milne, and Coriaty) in the same cell throughout the trial. Appellants moved for a new trial,[7] alleging that the housing arrangements violated a sequestration order issued by the district court. The government not only contested appellants' conclusion but also contested the premise on which the conclusion rested, asserting that, though the three men were lodged within the same cell block, they did not share a cell.

For reasons that are somewhat opaque, the district court denied the motion without a hearing and without findings anent the accuracy of appellants' "three to a cell" allegation. Instead, the court determined that, regardless of the dormitory arrangements, its sequestration order had not been flouted. It is against this rather spartan background that we undertake our analysis.[8]

### A. *Rule 615.*

 The *sanctum sanctorum* of supervised sequestration states in its salient segment:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion.

Fed.R.Evid. 615. The rule more or less codifies common-law sequestration powers, but it is at once less discretionary and less stringent than its forebears. On one hand, the rule cabins the judge's discretion by affording all parties a *right* to close the courtroom to prospective witnesses.[9] On the other hand, while the common law supported se-

---

6. Both Santos and Malone also testified that they bought cocaine from defendant Richard Labrie at Johnson's abode.

7. These motions are separate from, and much earlier in time than, the motions to which we alluded in note 2, *supra.* Nonetheless, these motions, like the later motions, invoked Fed. R.Crim.P. 33. We grant appellants a considerable indulgence, assuming *arguendo* that the information concerning the witnesses' living arrangements was not discoverable before or during trial with the exercise of due diligence. *See United States v. Slade,* 980 F.2d 27, 29 (1st Cir.1992) (articulating standard); *United States v. Natanel,* 938 F.2d 302, 313 (1st Cir.1991) (similar), *cert. denied,* — U.S. —, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992).

8. To recognize that the record sheds no light on the factual underpinnings of the sequestration dispute is not to imply that the defense lacked opportunity to explore the possibility of sequestration violations. During trial, appellants cross-examined all three witnesses at length, inquiring, *inter alia,* whether they had discussed the case with others. The examination elicited no evidence that the trio traded tales concerning past, present, or future testimony. *Cf. United States v. Eyster,* 948 F.2d 1196, 1210 (11th Cir.1991) (finding that witnesses housed in the same cell who admitted discussing testimony with each other violated a sequestration order). Moreover, appellants knew all along that Perez, Milne, and Coriaty dwelled at the same penitentiary, yet they made no specific inquiries about the congregant housing arrangement.

9. The rule's stringencies in that respect have not been adopted by all states. *See* 6 John Wigmore, *Evidence* § 1837, at 458 n. 11 (1976); *see also id.* at 35 (Supp.1991) (compiling data). Rather, many states continue to leave sequestration decisions solely within the judge's discretion. *See, e.g.,* R.I.R.Evid. 615.

questration beyond the courtroom, *see* 6 John Wigmore, *Evidence* § 1840, at 471 n. 7 (1976) (stating that, at common law, the sequestration process involves three parts: preventing prospective witnesses from consulting each other; preventing witnesses from hearing other witnesses testify; and preventing prospective witnesses from consulting witnesses who have already testified), Rule 615 contemplates a smaller reserve; by its terms, courts must "order witnesses excluded" only from the courtroom proper, *see Perry v. Leeke*, 488 U.S. 272, 281 & n. 4, 109 S.Ct. 594, 600 & n. 4, 102 L.Ed.2d 624 (1989); *United States v. Arruda*, 715 F.2d 671, 684 (1st Cir.1983). In sum, the rule demarcates a compact procedural heartland, but leaves appreciable room for judicial innovation beyond the perimeters of that which the rule explicitly requires. *See United States v. De Jongh*, 937 F.2d 1, 3 (1st Cir.1991) (stating that district courts possess "considerable discretion" to fashion orders pertaining to sequestration).[10]

 Outside of the heartland, the district court may make whatever provisions it deems necessary to manage trials in the interests of justice, *see id.,* including the sequestration of witnesses before, during, and after their testimony, *see Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 1335, 47 L.Ed.2d 592 (1976), and compelling the parties to present witnesses in a prescribed sequence, *see United States v. Machor*, 879 F.2d 945, 954 (1st Cir.1989), *cert. denied*, 493 U.S. 1094, 110 S.Ct. 1167, 107 L.Ed.2d 1070 (1990). Rule 615 neither dictates when and how this case-management power ought to be used nor mandates any specific extra-courtroom prophylaxis, instead leaving the regulation of witness conduct outside the courtroom to the district judge's discretion. *See United States v. Arias–Santana*, 964 F.2d 1262, 1266 (1st Cir.1992) (explaining that a federal trial court may enter non-discussion orders at its discretion); *see also Arruda*, 715 F.2d at 684 (holding that there

was "technically" no violation of sequestration where witnesses conversed *outside* the courtroom).

This is not to say, however, that sequestration orders which affect witnesses outside the courtroom are a rarity. As a practical matter, district courts routinely exercise their discretion to augment Rule 615 by instructing witnesses, without making fine spatial distinctions, that they are not to discuss their testimony. Indeed, such non-discussion orders are generally thought to be a standard concomitant of basic sequestration fare, serving to fortify the protections offered by Rule 615. *See Perry*, 488 U.S. at 281–82, 109 S.Ct. at 600–01.

### B. *Sequestration and Cohabitation.*

Here, appellants moved in advance of trial for sequestration without indicating to the court what level of restraint they thought appropriate. The court granted the motion in its simplest aspect, directing counsel "to monitor sequestration" and ordering "that witnesses who are subject to [the court's] order are not to be present in the courtroom at any time prior to their appearance to render testimony." At trial, the district court expanded its earlier order beyond the Rule 615 minimum, instructing each witness at the close of his or her testimony not to discuss that testimony with any other witness. Appellants accepted the conditions of sequestration described by the court without demurrer. What is more, they did not request any further instructions, say, that witnesses be directed at the end of each day, or before each recess, not to discuss their testimony. Thus, every witness was placed under an order prohibiting discussion of the case with other witnesses only upon the completion of his or her testimony.

On these facts, the district court's denial of relief must be upheld. The court's basic sequestration order, which ploughed a straight furrow in line with Rule 615 itself, did not extend beyond the courtroom. There

---

**10.** Citing *United States v. Greschner*, 802 F.2d 373 (10th Cir.1986), *cert. denied*, 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987), appellants postulate that Rule 615 requires sequestration beyond the courtroom door. Although *Greschner* does equate "circumvention" of Rule 615

with a violation of the rule itself, it concedes that controlling such circumvention rests within the district court's discretion—a condition that clearly does not apply to violations of Rule 615 itself. *Id.* at 375–76. Thus, *Greschner* fails to support appellants' thesis.

has been no intimation that the witnesses transgressed this order. Moreover, because the district court did not promulgate a non-discussion order applicable to any witness until the conclusion of that witness's testimony, Perez, Milne, and Coriaty were under no obligation, prior to that moment, to refrain from discussing their recollections with each other. Finally, there is no evidence that any of the three ever chatted about the case with another witness after having been admonished to the contrary—or at any earlier time, for that matter.

Given this predicate, appellants' plaint reduces to the unprecedented proposition that witness cohabitation constitutes an automatic violation of a standard sequestration order. The crux of sequestration, however, is communication between witnesses, not shared accommodations or geographic proximity. Social settings, such as communal housing or common work sites, may offer opportunities for witnesses to compare notes and gossip about their testimony, but such environments do not ensure that forbidden conversations will occur. We assume that witnesses, like all other persons subject to court orders, will follow the instructions they receive. *Cf., e.g., Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987) (reiterating the "invariable assumption of the law that jurors follow their instructions"). We conclude, therefore, that the housing arrangement, in and of itself, did not violate an existing sequestration order.

If doubt inhered—and we see no room for any—two other considerations would then be decisive. In the first place, a district court's interpretation of its own order is customarily accorded great weight. *See, e.g., Witty v. Dukakis,* 3 F.3d 517, 521 (1st Cir.1993); *Martha's Vineyard Scuba Hqtrs., Inc. v. Unidentified, Wrecked & Abandoned Steam Vessel,* 833 F.2d 1059, 1066–67 (1st Cir.1987); *Lefkowitz v. Fair,* 816 F.2d 17, 22–23 (1st Cir.1987). Here, the district court ruled that congregant housing of witnesses did not infringe on the sequestration that it decreed. When a trial court's interpretation of its own order tracks plain language and

the actual sequence of events, that interpretation must be honored on appeal.

In the second place, even if some implied ban on congregant housing of prisoner-witnesses existed, breach of a sequestration order would not automatically call for a new trial; rather, the need for a sanction, and the nature of one, if imposable, are matters committed to the trial court's sound discretion. *See United States v. Rossetti,* 768 F.2d 12, 16 (1st Cir.1985); *Arruda,* 715 F.2d at 684. Appellants' failure to request a broader sequestration order, coupled with the speculative nature of their claim of actual prejudice, renders it impossible to find an abuse of discretion here. *See, e.g., Rossetti,* 768 F.2d at 16.

To sum up, our search of the record in this case discloses no reason to suspect that the government or its witnesses transgressed the existing sequestration order. And as we have indicated, if appellants desired a more vigorous sequestration regime, such as an edict that would have banned cohabitation or other contact amongst prisoner-witnesses, they had a duty to ask for it. They failed to do so. Under these circumstances, the district court appropriately declined to overturn the convictions. *See, e.g., De Jongh,* 937 F.2d at 3; *Rossetti,* 768 F.2d at 16; *see also Langel v. United States,* 451 F.2d 957, 963 (8th Cir.1971) (determining that district court's refusal to restrict witnesses from communicating with other witnesses, after some had testified, did not constitute error; defendants made "no showing ... that Government witnesses did talk to each other after testifying").

## IV. DISPUTES ANENT DISCOVERY

Appellants complain vociferously about the government's conduct during discovery. The complaints have a modest basis in fact. Over the course of this logistically complex trial, the government produced a number of documents in a seemingly lackadaisical fashion. On each of these occasions, defense counsel had to scramble in order to assess the nascent discovery and integrate it into their trial strategy. On other occasions, the government refused to produce documents that defense counsel believed were discoverable ei-

ther as exculpatory material, *see Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), or as fodder for impeachment, *see Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *see also* 18 U.S.C. § 3500 (1988) (requiring the government to disclose, after direct testimony and on the defendant's motion, any statement by the witness, in the government's possession, that relates to the subject matter of the witness's testimony). We discuss these two species of discovery problems separately.

## A. *Delayed Discovery.*

 Prosecutors have an obligation to furnish exculpatory and impeachment information to the defense in a timely fashion. Although the government's obligation goes beyond the good-faith requirement of civil discovery, *see United States v. Samalot Perez,* 767 F.2d 1, 4 (1st Cir.1985), its bounds are not limitless. Patrolling these boundaries is primarily the duty of the *nisi prius* court. Because the district judge is better attuned to the nuances of the trial, this court must take a deferential view of rulings made in the course of that patrol.

When discovery material makes a belated appearance, a criminal defendant must ordinarily seek a continuance if he intends to claim prejudice. A continuance affords time to study the newly emergent information, consider its possible ramifications, change trial strategy (if necessary), assess any potential prejudice, and determine how best to use the information. As a general rule, a defendant who does not request a continuance will not be heard to complain on appeal that he suffered prejudice as a result of late-arriving discovery. *See, e.g., United States v. Osorio,* 929 F.2d 753, 758 (1st Cir. 1991); *see also United States v. Diaz–Villafane,* 874 F.2d 43, 47 (1st Cir.) (concluding, in an analogous context, that a defendant's cry of unfair surprise "is severely undermined, if not entirely undone, by his neglect to ask the district court for a continuance to meet the claimed exigency"), *cert. denied,* 493 U.S. 862, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989). Thus, in situations where defense counsel does not seek a continuance upon belated

receipt of discoverable information, a court often can assume that counsel did not need more time to incorporate the information into the defense's game plan. *See United States v. Ingraldi,* 793 F.2d 408, 413 (1st Cir.1986).

 This general rule spells defeat for the majority of appellants' delayed discovery claims. In every instance save one, appellants eschewed a request for a continuance. They have never satisfactorily explained how delays in production caused them any cognizable harm on those several occasions and the record, which reflects that appellants assimilated the new material without any perceptible hitch and used it to good effect, belies any such claim. The lack of demonstrable prejudice sounds the death knell for a "delayed discovery" claim. *See United States v. Devin,* 918 F.2d 280, 290 (1st Cir. 1990) (explaining that a defendant who complains about tardiness in disclosure "cannot rely on wholly conclusory assertions but must bear the burden of producing, at the very least, a *prima facie* showing of a plausible strategic option which the delay foreclosed"). Hence, we find appellants' delayed discovery claims, with one exception, to have been waived.

 The facts referable to the remaining dilatory disclosure claim can be succinctly summarized. Perez not only worked as a courier for David Sepulveda, but also supported his own cocaine habit by peddling drugs. After he was apprehended for selling cocaine, Perez agreed to testify against appellants in return for the United States Attorney's help in seeking a reduced sentence. Since Perez was the only witness who tied all the defendants to David Sepulveda's illicit enterprise, his testimony was extremely important to the government's case.

When defense lawyers began cross-examining Perez, it became apparent that the FBI records furnished in pretrial discovery did not list Perez's entire repertoire of criminal convictions, especially those stemming from state court proceedings and not reported to the FBI. When Perez acknowledged that a state probation officer had prepared a presentence report for a New Hampshire court, appellants asked for a continuance so that

they might obtain this document and more fully research Perez's criminal history. The district court denied the motion but offered to permit the defense to recall Perez for further cross-questioning should the new information warrant it. The trial continued coincident with the defense's efforts to secure the presentence report.

After some travail, New Hampshire authorities agreed to release the report to the federal court *in camera*. The district judge found that it contained little fresh material but he nonetheless issued a turnover order. The defense received the report while Perez was still on the witness stand. The judge refused to grant a mistrial or afford appellants any comparable redress.

We see no error. The prosecution was caught unawares; it never knew of the report's existence and, therefore, could not have deliberately withheld it. Furthermore, the rigors of *Brady* do not usually attach to material outside the federal government's control—and the presentence report at issue here falls within the scope of this generality. *See, e.g., United States v. Aichele*, 941 F.2d 761, 764 (9th Cir.1991) (holding that a federal prosecutor had no duty to procure materials prepared for the state courts which were not otherwise under federal control).

■ Last, but far from least, delayed disclosure claims cannot succeed unless the aggrieved defendant demonstrates prejudice arising from the delay. *See Devin*, 918 F.2d at 290 (refusing to reverse conviction where delayed disclosure of impeachment material "had no effect on the outcome of the trial"); *Ingraldi*, 793 F.2d at 411–12 (stating that the critical test "is whether defendant's counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case"). Here, however, the defense's delayed receipt of the report did not hinder cross-examination to any appreciable degree. From the start of trial, appellants had a sizeable storehouse of data concerning Perez's checkered past. In comparison to what was already known, the report, which yielded a relatively inconsequential amount of incremental information, comprised small potatoes. Moreover, the timing of events minimized the possibility of prejudice. Appellants received the report while Perez was still testifying. They were able to incorporate its contents into their cross-examination and employ the information effectively. For aught that appears, the course and outcome of the trial would have been the same no matter when the report surfaced.

■ In our view, the presider's decision to allow a criminal case to go forward, notwithstanding delayed disclosure of material relevant to impeachment of a witness, should be upheld unless a manifest abuse of discretion looms. *See Devin*, 918 F.2d at 289. On this record, we can neither criticize the district court's exercise of its informed discretion nor tamper with the court's bipartite finding that the government violated no duty and that, in any event, appellants sustained no cognizable prejudice arising out of the presentence report's belated emergence.

### B. *Denied Discovery.*

■ Appellants also complain that the court below, after scrutinizing certain materials *in camera*, denied their motion to compel discovery. The materials in question consist of various police files, including interview notes. We have reviewed these materials and agree with the lower court that they are outside the purview of the Jencks Act, 18 U.S.C. § 3500, for two reasons. First, to be discoverable under the Jencks Act, a government record of a witness interview must be substantially a verbatim account. *See United States v. Newton*, 891 F.2d 944, 953–54 (1st Cir.1989). Second, the account must have been signed or otherwise verified by the witness himself. *See United States v. Gonzalez–Sanchez*, 825 F.2d 572, 586–87 (1st Cir.), *cert. denied*, 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987). The police files at issue here, including the interview notes, do not meet either of these guidelines and are, therefore, non-discoverable. *A fortiori*, the district court did not blunder in denying access to them.

### V. COCONSPIRATORS' STATEMENTS

During the course of trial, the judge allowed several witnesses to attribute out-of-

court statements to one or more declarants, finding, *inter alia*, that the declarants were coconspirators. Appellants assign error.

Although out-of-court statements made by non-testifying declarants ordinarily are excluded as hearsay if offered to prove the truth of the matter asserted, *see* Fed. R.Evid. 801(c), there are exceptions to the rule. One such exception provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. Fed.R.Evid. 801(d)(2)(E). To invoke the exception, a party who wants to introduce a particular statement must show by a preponderance of the evidence that a conspiracy embracing both the declarant and the defendant existed, and that the declarant uttered the statement during and in furtherance of the conspiracy. *See Bourjaily v. United States*, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987); *Ortiz*, 966 F.2d at 714–15. The party at whom the evidence is aimed must object to the statement when it is offered; and, if the district court accepts the evidence *de bene*, must then ask the court at the close of all the relevant evidence to strike the statement, *i.e.*, to consider whether the proponent fulfilled the requisite foundational requirements by a preponderance of the evidence. *See Ortiz*, 966 F.2d at 715; *United States v. Perkins*, 926 F.2d 1271, 1283 (1st Cir.1991); *see generally United States v. Ciampaglia*, 628 F.2d 632, 638 (1st Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980); *United States v. Petrozziello*, 548 F.2d 20, 23 n. 3 (1st Cir.1977).

On five occasions, at least one defendant objected to testimony anent coconspirators' out-of-court statements.[11] We treat these objections as fully preserved—after all, the district court told counsel that it deemed an objection by one defendant sufficient to preserve the rights of all defendants—and, accordingly, we plumb the record in an effort to determine whether any or all of the district court's rulings with respect to these statements were clearly erroneous. *See United States v. McCarthy*, 961 F.2d 972, 977

(1st Cir.1992); *United States v. Cresta*, 825 F.2d 538, 551 (1st Cir.1987), *cert. denied*, 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988).

We begin by considering three pieces of testimony recounting out-of-court statements. The common thread that joins these proffers is that the government adduced some other evidence tending to prove that the declarants were, in fact, coconspirators. We then address two pieces of testimony that are not cushioned in a comparable fashion.

### A. *Supported Statements.*

**1. *Milne Testimony.*** Milne (a self-confessed coconspirator) served as the wellspring of the first statement. He testified that a defendant, Edward Welch, told him that the police noticed cocaine on his (Welch's) bed in the course of executing a search warrant. The district court found that the declarant, Welch, was a coconspirator, and that Welch's statement was made during and in furtherance of the conspiracy. The finding is fully sustainable.

Both Coriaty and Milne testified that Welch sold them cocaine he had purchased from David Sepulveda (an arrangement that numerous other witnesses corroborated). This evidence encourages, if it does not demand, the conclusion that Welch worked hand in glove with Sepulveda. A pattern of drug sales between two individuals, looking toward resale to third persons, together with appropriate contextual detail, can support a finding that the two individuals were jointly involved in a drug-trafficking conspiracy. *See United States v. Moran*, 984 F.2d 1299, 1303 (1st Cir.1993); *United States v. Glenn*, 828 F.2d 855, 857–58 (1st Cir.1987). The record likewise justifies the conclusion that Welch's statements to Milne were made during and in furtherance of the conspiracy. We think it is common ground—and common sense—that the reporting of significant events by one coconspirator to another advances the conspiracy. *See United States v. Smith*, 833 F.2d 213, 219 (10th Cir.1987).

---

11. On a sixth occasion, defendant Driesse objected to another statement. Inasmuch as that statement implicated Driesse alone, we regard the ensuing assignment of error as beyond the scope of this opinion. *See supra* note 2.

**2. Rice Testimony.** Another government witness, John Rice, testified that one defendant, Driesse, mentioned that a second defendant, Rood, sold cocaine for the Sepulveda brothers. The jury found both Driesse and Rood guilty of the conspiracy charge, and the record gives considerable definition to both men's links to the drug ring. And, moreover, since the sharing of pertinent information about a conspiracy's mode of operation furthers the conspiratorial ends, *see United States v. Munson,* 819 F.2d 337, 341 (1st Cir.1987), Driesse's statement concerning drug sales assisted the charged conspiracy by informing other coconspirators of Rood's role and activities.

**3. Malone Testimony.** A third statement came in through a police officer, Kathy Malone, who made a number of undercover buys from Sepulveda-supplied vendors. She testified that David Sepulveda's inamorata, Bambi Burley, told her that she (Bambi) had jilted Sepulveda and asked whether Malone might be "one of those girls that went to New York with him." Appellants challenge the admission of this statement on the sole ground that Burley, herself, was a stranger to the charged conspiracy. However, this challenge overlooks Perez's testimony that he collected drug debts for David Sepulveda and delivered the money to Burley. While there is hardly a profusion of evidence depicting Burley as a coconspirator, there is enough to withstand clear error review.[12]

### B. Unsupported Statements.

The two additional instances in which the court below admitted statements under the coconspirator exception despite contemporaneous objection are qualitatively different. In each instance, there appears to be no record evidence, other than the statement itself, to support its admissibility.

One statement arose during the government's examination of a police detective, Mark Putney. The detective testified that, while executing a search warrant at a dwelling occupied by defendant Cheryl Johnson and her husband, Brian, he answered the telephone:

> The male caller asked if Brian was home. I stated I was Brian. The caller stated did you pick up the stuff. I said I did. The caller asked if he could come over and pick up a half. I stated sure, come on over.

The other statement occurred during direct examination of Joseph Baranski. Baranski testified that he sometimes provided transportation for people going to David Sepulveda's house and that, on occasion, his passengers would tell him that they were visiting Sepulveda because "they wanted to buy some drugs."

Our review of the record has deterred no extrinsic evidence tending to show that these out-of-court declarants (the unidentified caller to the Johnson residence and the unidentified passengers in Baranski's vehicle) were involved in the conspiracy, and the government has directed us to no such proof. Following the Supreme Court's landmark opinion in *Bourjaily,* and Justice Stevens's concurrence, 483 U.S. at 185 & n. 2, 107 S.Ct. at 2783–84 & n. 2, several of our sister circuits have concluded that the preponderance of evidence required for the introduction of an out-of-court statement under Rule 801(d)(2)(E) must necessarily comprise more than the weight of the statement itself. *See, e.g., United States v. Gambino,* 926 F.2d 1355, 1361 n. 5 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 415, 116 L.Ed.2d 436 (1991); *United States v. Garbett,* 867 F.2d 1132, 1134 (8th Cir.1989); *United States v. Silverman,* 861 F.2d 571, 577 (9th Cir.1988); *United States v. Zambrana,* 841 F.2d 1320, 1344–45 (7th Cir.1988); *see also United States v. Daly,* 842 F.2d 1380, 1386 (2d Cir.), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988). We have not yet spoken to the point. *See, e.g., United States v. Dworken,* 855 F.2d 12, 25 (1st Cir.1988) (deferring resolution).

This case presents the issue squarely and requires that we decide it. We

---

**12.** It seems problematic whether these statements furthered the conspiracy. We need not mull this question, however, as appellants did not advance this ground either in the lower court or in their briefs. The issue is, therefore, waived. *See United States v. Slade,* 980 F.2d 27, 31 (1st Cir.1992). In all events, the statements seem harmless.

hold that a coconspirator's statement, standing alone, is insufficient to meet the preponderance standard of Rule 801(d)(2)(E). In other words, to satisfy the weight-of-the-evidence criteria for that hearsay exception, there must be some proof *aliunde*. Though the district court may consider a statement's contents and the circumstances attending its utterance when gauging the statement's reliability, *see United States v. Gomez–Pabon*, 911 F.2d 847, 856 n. 3 (1st Cir.1990), *cert. denied*, 498 U.S. 1074, 111 S.Ct. 801, 112 L.Ed.2d 862 (1991), admitting the statement into evidence requires some extrinsic proof of the declarant's involvement in the conspiracy. Thus, because the government developed no independent evidence of who Brian Johnson's callers or Joseph Baranski's passengers might have been, or what their status might have been vis-a-vis the charged conspiracy, the statements were improperly admitted under the coconspirator exception to the hearsay rule.[13]

■■■■ There is no bright-line rule for divining when particular errors that result in a jury's exposure to improper evidence are (or are not) harmless. Rather, a harmlessness determination demands a panoramic, case-specific inquiry considering, among other things, the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, the relative strengths of the parties' cases, and any telltales that furnish clues to the likelihood that the error affected the factfinder's resolution of a material issue. Gearing our inquiry along these lines, we conclude that the errors in admitting the statements are benign. The telephone talk concerned a peripheral matter, for Brian Johnson was not on trial. Furthermore, several witnesses testified at first hand that his wife and housemate, appellant Cheryl Johnson, trafficked in cocaine. *See supra* Part II(D). The passengers' remarks constituted cumulative evidence. They inculpated only David Sepulveda, and a googol of witnesses tabbed Sepulveda as a large-scale narcotics distributor who made countless cocaine sales. Several of these witnesses swore that they personally purchased drugs from him. Against this tidal wave of evidence, Baranski's testimony was a drop in the proverbial bucket. Because the record offers every assurance that the errant statements did not affect the trial's outcome, they were harmless.[14] *See United States v. Ladd*, 885 F.2d 954, 957–58 (1st Cir.1989); *Dworken*, 855 F.2d at 26.

## VI. EXPERT TESTIMONY

At trial, the government's case culminated in the testimony of Commander Richard Gerry of the New Hampshire Drug Task Force. Before Commander Gerry testified, the prosecutor told the court that Gerry's views would be based upon the trial testimony and his experience as a police officer, and predicted that Gerry would "explain to the jury how the quantities of drugs ... referred to in the ... testimony at trial [were] used and distributed ... from the business aspect." Based on this representation, the court denied appellants' motion *in limine* and permitted the witness to testify.

In the initial stages, the testimony went according to plan: Commander Gerry discussed the ways in which drug dealers commonly package their products and reviewed the economics of the cocaine trade (illustrat-

---

13. We do not mean to imply that the evidence might not have been introduced for some other purpose. Suppose, for example, that the telephone calls Putney received were not offered to show that someone in fact sought to buy drugs from Brian Johnson, but, rather, to show the types of telephone calls the Johnsons received. If admissible on that basis, the statements would not be excludable as hearsay. *See* Fed.R.Evid. 801(c); *see also United States v. Green*, 887 F.2d 25, 27 (1st Cir.1989) (upholding admission of out-of-court statement to show motive, not for the truth of the matter asserted).

14. Appellants also assign error to four statements that were admitted without objection. Absent a showing of plain error, the failure to object below is fatal to claims that particular evidence should not have reached the jury. *See Ortiz*, 966 F.2d at 715; *Perkins*, 926 F.2d at 1283; *see also* Fed.R.Evid. 103(a). We find no plain error in connection with the admission of the four statements; their introduction, whether viewed singly or in combination, did not "seriously affect the fundamental fairness and basic integrity of the [trial]," *United States v. Griffin*, 818 F.2d 97, 100 (1st Cir.), *cert. denied*, 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987), or otherwise impair appellants' substantial rights.

ing the profit to be gained by buying and selling in various quantities). Despite this promising start, matters soon deteriorated. Although Commander Gerry offered opinions as to appellants' roles in the enterprise, characterizing David Sepulveda as "top dog" and the others as rank-and-file members of the organization, cross-examination revealed that these opinions were less the fruit of an expert mind attuned to the testimony in the case than the yield of undifferentiated conversations over the years with unidentified police officers regarding Sepulveda and his associates. So ingrained were the roots of Commander Gerry's opinions that he was unable to specify the sources of his information or, in the end, articulate a plausible basis for his views. The speculative nature of Gerry's testimony became starkly apparent when the defense established that he had heard only bits and pieces of the testimony in the case. These rather startling insights cast grave doubt upon both the adequacy of the foundation on which Gerry's testimony rested and the existence of a fair opportunity for effective cross-questioning.

■ Midway through cross-examination the defense moved to strike the expert's testimony *in toto.* The district court granted the motion. We think the defects in the expert's presentation warranted this step. Fed.R.Evid. 705 provides in pertinent part that an expert witness "may ... be required to disclose [on cross-examination] the underlying facts or data" on which his opinions rest. If cross-examination reveals that the opinions advanced by an expert rest on a wholly inadequate foundation, the judge, on timely motion, may strike the testimony. *See, e.g., United States v. Scop,* 846 F.2d 135, 142–43 (2d Cir.1988); *Benjamin v. Peter's Farm Condo. Owners Ass'n,* 820 F.2d 640, 641 (3d Cir.1987); *see also* 3 David W. Louisell et al., *Federal Evidence* § 400, at 709–10 (1979).

The district judge also told the jury to disregard the offending testimony "entirely." His instruction was firm, clear, and to the point. Appellants neither objected to its form nor sought to have the judge improve upon it. The next day, however, appellants moved for a mistrial. The judge denied the motion. On appeal, appellants lament the denial of both their original motion *in limine* and their subsequent motion for a mistrial.

### A. *The Motion in Limine.*

■ The admission of expert testimony is governed by Fed.R.Evid. 702, which authorizes the district court to admit such testimony if, and to the extent that, it will "assist the trier of fact to understand the evidence or to determine a fact in issue...." *Id.* Because gauging an expert witness's usefulness is almost always a case-specific inquiry, the law affords trial judges substantial discretion in connection with the admission or exclusion of opinion evidence. *See Apostol v. United States,* 838 F.2d 595, 599 (1st Cir.1988); *United States v. Hoffman,* 832 F.2d 1299, 1310 (1st Cir.1987); *see also* 3 Jack Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 702[02] at 702–22 to 702–23 (1993). It follows that a trial judge's rulings in this sphere should be upheld "unless manifestly erroneous." *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); *see also Hoffman,* 832 F.2d at 1310 (explaining that "the district court's assessment of what will or will not assist the jury is entitled to considerable deference in the Rule 702 milieu").

■ Given the government's preliminary proffer, there was no need for outright exclusion of the anticipated testimony. The Supreme Court has recently reaffirmed that when a party proffers an expert, the trial judge performs a gatekeeping function, determining whether it is reasonably likely that the expert possesses specialized knowledge which will assist the trier better to understand a fact in issue. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* — U.S. —, —, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993). The witness's opinions need "not [be] based on first-hand knowledge or observation." *Id.* at —, 113 S.Ct. at 2796.

Seen in light of these authorities, the district court had a reasonable basis for allowing the expert to testify. If Commander Gerry's pedagogy proved to be as advertised, his testimony arguably would have assisted the jury in understanding the voluminous evidence that had emerged. Experienced in-

vestigators are commonly permitted to testify as experts on topics such as the structure of a criminal enterprise, the economics of the drug trade, and the handling of contraband. *See, e.g., United States v. Angiulo,* 897 F.2d 1169, 1188–89 (1st Cir.) (allowing veteran FBI agent to offer opinions, based mainly on information presented at trial, about defendants' roles in gambling ring), *cert. denied,* 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990); *Ladd,* 885 F.2d at 959 (allowing experienced police officer to testify about methods of packaging and processing heroin, and relationship to distribution venture); *United States v. Angiulo,* 847 F.2d 956, 973–75 (1st Cir.) (allowing suitably credentialed agent to offer expert opinions about structure and operation of La Cosa Nostra, including defendants' relationships to that organization), *cert. denied,* 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988); *Hoffman,* 832 F.2d at 1310 (allowing knowledgeable federal agent to testify as an expert on the practices and idiom of the cocaine community).

In sum, the lower court's denial of the motion *in limine* cannot be faulted. The unhappy fact that, in hindsight, the expert turned out to be a dud does not retroactively negate the lawfulness of the court's original ruling. Trial judges, whose lot is often to make swift battlefield decisions on tangled evidentiary matters, cannot be expected to foretell the future with absolute accuracy.[15]

## B. *The Motion for Mistrial.*

Appellants' next assignment of error presents a slightly closer question. Although the district court struck Commander Gerry's half-completed testimony and told the jurors to disregard what they had heard, appellants assert that the court erred in refusing to grant a mistrial. At the core of appellants' argument lies their insistence that the judge did no more than hold a farthing candle to the sun; once Gerry's views were aired, words from the bench, no matter how stento-

rian the judge's tone, could not exorcise the resultant prejudice.

 Granting or denying a motion for a mistrial is a matter committed to the trial court's discretion. *See De Jongh,* 937 F.2d at 3; *United States v. Chamorro,* 687 F.2d 1, 6 (1st Cir.), *cert. denied,* 459 U.S. 1043, 103 S.Ct. 462, 74 L.Ed.2d 613 (1982). The exercise of that discretion always must be informed by the circumstances of the particular case. When, as now, a motion to declare a mistrial has its genesis in a claim that improper evidence came before the jury, the court must first weigh the claim of impropriety and, if that claim is well founded, strike the offending evidence. Next, unless the court believes that the evidence is seriously prejudicial and that a curative instruction will be an insufficient antidote, the court should proceed with the trial after instructing the jury to disregard the evidence. Declaring a mistrial is a last resort, only to be implemented if the taint is ineradicable, that is, only if the trial judge believes that the jury's exposure to the evidence is likely to prove beyond realistic hope of repair.

 In this instance, Judge Devine followed the standard paradigm as closely as possible, considering appellants' delay in offering the mistrial motion. Three factors persuade us that he handled the situation in an appropriate manner. First, courts have long recognized that, within wide margins, the potential for prejudice stemming from improper testimony or comments can be satisfactorily dispelled by appropriate curative instructions. *See, e.g., United States v. Figueroa,* 900 F.2d 1211, 1216 (8th Cir.), *cert. denied,* 496 U.S. 942, 110 S.Ct. 3228, 110 L.Ed.2d 675 (1990); *United States v. Ferreira,* 821 F.2d 1, 5–6 (1st Cir.1987); *United States v. Cirrincione,* 780 F.2d 620, 635 (7th Cir.1985). The instructions given here pass the test of appropriateness; indeed, appel-

---

15. When uncertainty attends a proffer of opinion evidence, *voir dire* screenings are standard fare. *See, e.g., Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.,* 958 F.2d 1169, 1175 & n. 4 (1st Cir. 1992); *Freeman v. Package Mach. Co.,* 865 F.2d 1331, 1337 (1st Cir.1988); *cf. United States v. Griffin,* 818 F.2d 97, 105 (1st Cir.) (discussing utility of *voir dire* in an analogous context), *cert. denied,* 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987). But although appellants moved *in limine* to forfend Gerry's testimony, they apparently never sought permission to conduct a *voir dire.*

lants have not suggested any way in which they might have been improved.

■ Second, Judge Devine did not allow sores to fester. Rather, he halted Commander Gerry's testimony in midstream and instructed the jurors to discard the faulty evidence. Swiftness in judicial response is an important element in alleviating prejudice once the jury has been exposed to improper testimony. *See, e.g., United States v. Pryor,* 960 F.2d 1, 2–3 (1st Cir.1992); *United States v. Hernandez,* 891 F.2d 521, 523 (5th Cir. 1989), *cert. denied,* 495 U.S. 909, 110 S.Ct. 1935, 109 L.Ed.2d 298 (1990). In this case, the judge could scarcely have acted more celeritously.

[47] Third, appellate courts inquiring into the effectiveness of a trial judge's curative instructions should start with a presumption that jurors will follow a direct instruction to disregard matters improvidently brought before them. *See United States v. Olano,* — U.S. —, —, 113 S.Ct. 1770, 1781, 123 L.Ed.2d 508 (1993); *Richardson,* 481 U.S. at 206, 107 S.Ct. at 1706–07. Though rebuttable, the presumption endures unless it appears probable that, in a particular case, responsible jurors will not be able to put the testimony to one side, and, moreover, that the testimony will likely be seriously prejudicial to the aggrieved party. *See United States v. Paiva,* 892 F.2d 148, 160 (1st Cir. 1989) (collecting cases).

Read as a whole, Commander Gerry's partially completed testimony does not strike us as so compelling that its impact would linger even after the court's stern admonition. The testimony is virtually indistinguishable from the vast array of other evidence introduced by the prosecution, and, therefore, it is of the cumulative vintage.[16] We have routinely found cumulative evidence impotent when ac-

cidentally uncorked. *See, e.g., United States v. Ellis,* 935 F.2d 385, 393 (1st Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 201, 116 L.Ed.2d 160 (1991); *United States v. Morris,* 700 F.2d 427, 431 (1st Cir.), *cert. denied,* 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983). So it is here. Appellants have not successfully rebutted the presumption that the jury heeded the judge's instructions.

■ In a last-ditch effort to save the day, appellants come at the question of undue prejudice from a slightly more oblique angle. They allege that the government's questioning of Commander Gerry went so far beyond the limits of propriety that putting him on the witness stand amounted to prosecutorial misconduct. But the record simply does not support this accusation. The government had a reasonable basis for offering Gerry as an expert witness. Although the decision did not pan out, that is no reason to consign either the prosecutor or the prosecution to the juridical equivalent of philotheoparoptesism. Like judges, prosecutors cannot be held to a standard of utter prescience.[17]

For these reasons, we discern no abuse of discretion in either the district court's initial admission of Commander Gerry's testimony or the court's refusal to declare a mistrial after the necessity to strike the testimony arose. In a nutshell, there was no reason to believe that the infelicitously offered evidence remained in the jurors' minds after it was banished from the case, and, consequently, no need for the court to jettison the baby when the bath water turned tepid.

## VII. CLOSING ARGUMENT

Appellants contend that the prosecutors' comments during closing argument constituted reversible error because some statements spotlighted appellants' joint decision not to

**16.** It is, perhaps, worth noting that the only defendant discussed in any detail by the witness was David Sepulveda—a defendant as to whom the prosecution adduced overwhelming evidence of guilt. We add that, although there were different quanta of evidence as to each defendant, a painstaking review of the record inspires confidence that Gerry's testimony had no significant spillover effect vis-a-vis other defendants.

**17.** Moreover, if blame is to be assigned, appellants must share in it. They could have, but did not, ask for a *voir dire. See supra* note 15. A party who elects not to request *voir dire* of an opponent's expert runs certain risks. When a predictable risk materializes, there is little incentive for courts to be sympathetic. *Cf., e.g., Paterson–Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.,* 840 F.2d 985, 989 (1st Cir.1988) ("Courts, like the Deity, are most frequently moved to help those who help themselves.").

testify and others unfairly inflamed the jury's passions.[18] Although these contentions are obviously related, we analyze them separately.

### A. *Comments on Defendants' Silence.*

■ We begin with bedrock. The Fifth Amendment forbids any comment by the prosecutor on the defendant's exercise of the right to remain silent. *See United States v. Robinson,* 485 U.S. 25, 30, 108 S.Ct. 864, 868, 99 L.Ed.2d 23 (1988); *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). The proposition is more easily stated than applied. There is no bright line marking the precipice between a legitimate assessment of defense witnesses and an impermissible encroachment upon the accused's silence. Prosecutors who choose to explore such rugged terrain must take particular care not to comment upon, or call the jury's attention to, a defendant's failure to take the witness stand. *See United States v. Lavoie,* 721 F.2d 407, 408 (1st Cir.1983), *cert. denied,* 465 U.S. 1069, 104 S.Ct. 1424, 79 L.Ed.2d 749 (1984); *Rodriguez–Sandoval v. United States,* 409 F.2d 529, 531 (1st Cir. 1969).

■ Nonetheless, the road runs in both directions, leading to a rough mutuality of obligation. Defense attorneys have a responsibility to exercise reasonable vigilance and direct the trial court's immediate attention to perceived trespasses. *See generally Ortiz,* 966 F.2d at 715 (pointing out that "attorneys must usually bear the responsibility for preserving their points"); *United States v. Griffin,* 818 F.2d 97, 100 (1st Cir.) (discussing the "obligation to alert the district judge to error-in-the-making"), *cert. denied,* 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987). Although excessive summations may on rare occasions constitute plain error, redressable after the fact notwithstanding the absence of a contemporaneous objection, *see, e.g., Arrieta–Agressot v. United States,* 3 F.3d 525, 528 (1st Cir.1993), a criminal defendant who believes that a prosecutor's closing argument goes too far must usually object to

the offending statements when and as they are uttered. *See id.* In this way, the prosecution can clarify ambiguities and correct mislocutions in a timely manner, and, if necessary, the trial judge can administer an immediate antidote, thereby curtailing any damage.

■ None of the appellants chose to testify at trial. Yet, the prosecutors courted trouble in both segments of their closing argument. Initially, one of them asked rhetorically:

> Did anyone come into this courtroom and say what the Government witnesses told you didn't happen? Did they? They attacked the witnesses, the DEA, the police officers, [and the government attorneys] . . . .

On rebuttal, her colleague expanded upon (and twice repeated) the same theme:

> The United States introduced a lot of evidence during this trial, a lot of facts. And for the most part, there is no evidence in this case to show that what our witnesses said happened did not happen. That is, the defendants have done little or nothing to refute that evidence.

> \* \* \* \* \* \*

> Ladies and gentlemen, we stand on the evidence, the overwhelming evidence, the evidence which, for the most part, the defendants have done absolutely nothing to refute . . . .

It was only after the jury had been dismissed for the day that appellants, having sat silently throughout both segments of the prosecutors' summations, moved for a mistrial based in part on the quoted statements. The trial court denied the motion as untimely and sent the case to the jury the next morning. In the course of the charge, Judge Devine stated on five separate occasions that the government was responsible for carrying the burden of proof, that the defendants had the right to remain silent, and that no inferences

---

18. We use "prosecutors" in the plural because one government attorney delivered the initial summation and another handled rebuttal.

might be drawn from the defendants' election not to testify.[19]

In assaying the appropriateness of a prosecutor's remarks, context frequently determines meaning. *See, e.g., United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985); *United States v. Akinola,* 985 F.2d 1105, 1111 (1st Cir.1993); *United States v. Lilly,* 983 F.2d 300, 307 (1st Cir.1992). Once the prosecutor's words are placed in context, we inquire whether "the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Glantz,* 810 F.2d 316, 322 (1st Cir.) (citations omitted), *cert. denied,* 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987); *see also Lilly,* 983 F.2d at 307.[20] In borderline cases, the standard of review can figure importantly. When no contemporaneous objection appears of record, appellate review is for plain error. *See Arrieta–Agressot,* 3 F.3d at 528; *United States v. Smith,* 982 F.2d 681, 682 (1st Cir. 1993); *see also* Fed.R.Crim.P. 52(b). And in the absence of a contemporaneous objection it seems fair to give the arguer the benefit of every plausible interpretation of her words. *See United States v. Donlon,* 909 F.2d 650, 656–57 (1st Cir.1990); *Glantz,* 810 F.2d at 323; *cf. Robinson,* 485 U.S. at 31, 108 S.Ct. at 868 (noting that counsel's failure to object contemporaneously suggests that the arguer's statement is not ambiguous).

In this case, the prosecutors' remarks, taken in context and at face value, do not appear to constitute a comment on the accuseds' silence. The government's closing argument recounted the evidence against each defendant and, while admitting that certain prosecution witnesses possessed unsavory reputations and might profit by cooperation, the prosecutors urged the jury to find that those witnesses testified truthfully. Not surprisingly, defense counsels' summations played up the credibility theme, systematically besmirching the reliability of the government's witnesses, stressing internal inconsistencies, and outlining perceived conflicts between the testimony of different witnesses. Throughout, counsel paraded the cooperating witnesses' criminal records past the jury and made much of what those witnesses stood to gain by currying favor with the authorities.

Visualized against this backdrop, and assigning ordinary words their most natural meaning, the prosecution's argument that the defense had not successfully rebutted incriminating evidence seems not to be a comment on appellants' failure to testify but a comment about the credibility of the government's case. Arguments of this stripe do not trespass upon the accused's right to remain silent. *See Lockett v. Ohio,* 438 U.S. 586, 595, 98 S.Ct. 2954, 2959, 57 L.Ed.2d 973 (1978) (finding remarks that evidence was "unrefuted" and "uncontradicted" not to violate the Fifth Amendment); *see also United States v. Pitre,* 960 F.2d 1112, 1124 (2d Cir. 1992) (upholding a prosecutor's comment that defendant had offered no competing explanation); *United States v. Castillo,* 866 F.2d 1071, 1083 (9th Cir.1988) (upholding a prosecutor's remark about defendant's failure to rebut evidence); *United States v. Borchardt,* 809 F.2d 1115, 1119 (5th Cir.1987) (similar). Within the bounds of fair play and due process, prosecutors are not barred from making powerful arguments.

To be sure, it is conceivable that a juror hearing the prosecutors' words might have interpreted them as a commentary on appellants' joint decision not to testify. But we cannot decide this case based on what amounts to a doomsday scenario. After all, an appellate court is not at liberty to "infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or

---

**19.** To be sure, the judge did not specifically direct the jury to disregard the comments quoted above. Yet, appellants neither sought such an instruction nor objected to its absence. A trial court's failure to launch a limiting instruction *sua sponte* is not reversible error. *See, e.g., United States v. De La Cruz,* 902 F.2d 121, 134 (1st Cir.1990); *Rivera–Santiago,* 872 F.2d at 1083.

**20.** In this case, the district court apparently did not believe that the prosecutors intended the statements as a reflection on the defendants' failure to testify and appellants have not imputed so malign a motive to the prosecution team. We focus, therefore, on what the jury might have taken the statements to imply.

that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Lilly*, 983 F.2d at 307 (citation omitted); *see also Robinson*, 485 U.S. at 31, 108 S.Ct. at 868 (explaining "that an appellate court may [not] substitute its reading of ambiguous language for that of the trial court"). We are particularly unwilling to fish in the pool of ambiguity where the defendants did not contemporaneously object or otherwise bring the district court's attention to any potentially harmful circumlocution during the summations. Hence, we rule that the prosecutors' lack-of-refutation references did not require a mistrial.

### B. *Inflammatory Statements.*

The second half of appellants' challenge to the government's final argument implicates what appellants characterize as four attempts to inflame the jury, *viz.*, the prosecutors' suggestion that the jury could consider the effect on the community should the Sepulveda organization be able to continue in business;[21] two references to the "war on drugs";[22] and a monition that feelings of pity should be subordinated to the call of civic duty.[23] Because defendants failed to object to these remarks when they were voiced, we review them only for plain error. *See Smith*, 982 F.2d at 682. Under that regime, we are constrained to stay our hand unless improper remarks "so poisoned the well that the trial's outcome was likely affect-

ed." *United States v. Mejia–Lozano*, 829 F.2d 268, 274 (1st Cir.1987); *accord United States v. Mateos–Sanchez*, 864 F.2d 232, 240–41 (1st Cir.1988). None of the quoted statements comprise plain error in the setting of this trial.

**1. *Protection of the Community.*** The first statement, *see supra* note 21, went too far: prosecutors overreach when they ask jurors to function as *de facto* vigilantes. Yet, importantly, *cf. United States v. Lester*, 749 F.2d 1288, 1301 (9th Cir.1984), there is no sign that the buzznacking about the Sepulveda organization resuming operations, while gratuitous, was part of a pattern of remarks specifically intended to inflame the jury. The reference was not prominently featured in the summation; rather, it was prefatory, serving to introduce a recitation of evidence that had been presented at the trial. When, as in this case, the evidence of defendants' guilt is strong, courts should be very reluctant to find plain error in misguided rhetoric. *See United States v. Santana–Camacho*, 833 F.2d 371, 373–74 (1st Cir.1987); *Mejia–Lozano*, 829 F.2d at 274; *United States v. Capone*, 683 F.2d 582, 586–87 (1st Cir.1982). So here: we think it is wildly improbable, given the weight of the evidence, that what we read as an isolated, relatively subdued appeal for law enforcement affected the trial's outcome. Consequently, the resumption-of-business remarks do not furnish

---

**21.** The first prosecutor argued, *inter alia:*

> We put this organization out of business. And it's up to you to decide that it stays that way. Because ask yourselves, the business practices of this organization, this organized group of drug dealers, what practices will be allowed to continue in the streets of Manchester and the surrounding towns of New Hampshire if these people are allowed or permitted to revive the drug ring....

**22.** In rebuttal argument, the second prosecutor stated:

> It's a sad but true fact of law enforcement, particularly of this war on drugs, that if you're going to try to clean out the sewers, you've got to roll up your sleeves and get down in with the filth, and, ladies and gentlemen, I, for one, am proud to have gone down into those sewers and I'm proud to have been part of this prosecution team and I'm proud to be a small part of this war on drugs.

**23.** In rebuttal, the second prosecutor also suggested:

> [I]f perhaps you do feel sorry for anyone, then what I'm asking you to do, ladies and gentlemen, is to override any such feelings with your sense of duty as jurors, with your sense of responsibility as citizens, and with your desire to do the job you've sworn to do in this court of law. And consider this. During this testimony Kurt Coriaty said that if he had not been indicted and prosecuted for his drug dealings, that he would still be on the street today selling drugs. So ask yourselves, ladies and gentlemen, if you fail to do your duty as jurors and find any defendant not guilty just because you feel sorry for him, are you doing your community a service? Are you doing your families a service? And are you really doing that defendant a service?

a basis for reversal. *See United States v. Smith,* 918 F.2d 1551, 1562–63 (11th Cir. 1990); *Hernandez,* 891 F.2d at 527; *United States v. Monaghan,* 741 F.2d 1434, 1441 n. 30 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1085, 105 S.Ct. 1847, 85 L.Ed.2d 146 (1985).

**2. The War on Drugs.** A somewhat different set of considerations informs our analysis of the next two passages. Defense attorneys introduced the phrase "war on drugs" and used it repeatedly during their opening statements and, later, during their summations. Mindful of the environment created by the defense, we cannot say that the government's two rebuttal references to an ongoing war on drugs, though better left unsaid, comprised plain error. The ancient adage applies: what is sauce for the government's goose often may prove to be sauce for the defendants' gander.

 Although we deplore frank appeals to passion of the sort typified by "war on drugs" rhetoric, *see, e.g., Arrieta–Agressot,* 3 F.3d at 527, we regard it as settled that references to law enforcement efforts are not forbidden in summation if such references are incited or invited by, or fairly respond to, defendants' closing statements. *See, e.g., Smith,* 918 F.2d at 1563; *United States v. Brown,* 887 F.2d 537, 542 (5th Cir.1989); *Machor,* 879 F.2d at 956; *United States v. Bascaro,* 742 F.2d 1335, 1353–54 (11th Cir. 1984), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3476, 3477, 87 L.Ed.2d 613 (1985). Though there may well be exceptions to this rule,[24] no such exceptions lie for cases like this one—cases where the dysphemisms are few in number, do not escalate the level of fire and brimstone that characterized the defense's oratory, and do not provoke a contemporaneous objection. *See United States v. Tajeddini,* 996 F.2d 1278, 1285 (1st Cir. 1993); *Mejia–Lozano,* 829 F.2d at 274.

 **3. Discouraging Sympathy.** For somewhat similar reasons, we find the final challenged statement, quoted *supra* note 23, to fall within the pale. Viewed in context, this statement, which questioned whether an acquittal out of sympathy would be in the community interest, was made to dampen the defense's flirtation with jury nullification (described *infra* Part VIII). Courts should allow prosecutors greater leeway in rebuttal when the defense has itself breached the standards for proper summation. *See Young,* 470 U.S. at 11, 105 S.Ct. at 1044; *Lawn v. United States,* 355 U.S. 339, 359 n. 15, 78 S.Ct. 311, 323 n. 15, 2 L.Ed.2d 321 (1958); *Mejia–Lozano,* 829 F.2d at 274; *United States v. Flaherty,* 668 F.2d 566, 598 (1st Cir.1981). Applying this offshoot of the goose-and-gander principle, we hold that the challenged comment did not constitute plain error.

## VIII. JURY NULLIFICATION

The defendants invoked the specter of jury nullification during final arguments. Labrie's lawyer, in particular, invited the jury to "send out a question" concerning this doctrine. Three non-events followed; the government did not object to this soliloquy, the district court did not intervene *sua sponte,* and the court's charge did not broach the subject. Nevertheless, the deliberating jury took the invitation literally and asked the judge to "[c]larify the law on jury nullification." The court responded by telling the jury:

> Federal trial judges are forbidden to instruct on jury nullification, because they are required to instruct only on the law which applies to a case. As I have indicated to you, the burden in each instance which is here placed upon the Government is to prove each element of the offenses ... beyond a reasonable doubt, and in the event the Government fails to sustain its burden of proof beyond a reasonable doubt as to any essential element of any offense charged against each defendant, it has then failed in its burden of proof as to such defendant and that defendant is to be acquitted. In short, if the Government proves its case against any defendant, you should convict that defendant. If it fails to

---

**24.** We have, for instance, warned prosecutors that "there are limits to the extent that we will permit fighting fire with fire." *Mejia–Lozano,* 829 F.2d at 274. Merely because a defense attor- ney opens the door does not mean that a prosecutor can come storming through it in a pair of hobnailed boots.

prove its case against any defendant you must acquit that defendant.

Appellants objected to this supplemental instruction. They now argue that the instruction amounted to a wrongful repudiation of the time-honored concept of jury nullification.

■ The applicable rule is that, although jurors possess the raw power to set an accused free for any reason or for no reason, their duty is to apply the law as given to them by the court. *See United States v. Boardman,* 419 F.2d 110, 116 (1st Cir.1969), *cert. denied,* 397 U.S. 991, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970). Accordingly, while jurors may choose to flex their muscles, ignoring both law and evidence in a gadarene rush to acquit a criminal defendant, neither the court nor counsel should encourage jurors to exercise this power. *See United States v. Trujillo,* 714 F.2d 102, 106 (11th Cir.1983). A trial judge, therefore, may block defense attorneys' attempts to serenade a jury with the siren song of nullification, *see United States v. Garcia–Rosa,* 876 F.2d 209, 226 (1st Cir.1989); and, indeed, may instruct the jury on the dimensions of their duty to the exclusion of jury nullification, *see Trujillo,* 714 F.2d at 105–06 (collecting cases).

■ To the extent that appellants, during closing argument, managed to mention nullification, they received more than was their due. Having pocketed this gratuity, appellants now complain that they were not allowed to capitalize on it. When the jurors rose to the bait, appellants say, Judge Devine should have assured them that nullification is an "historical prerogative" of juries from time immemorial. We disagree. Though jury nullification has a long and sometimes storied past, *see Boardman,* 419 F.2d at 116, the case law makes plain that a judge may not instruct the jury anent its history, vitality, or use. *See, e.g., United States v. Desmarais,* 938 F.2d 347, 350 (1st Cir.1991) (collecting cases). This proscription is invariant; it makes no difference that the jury inquired, or that an aggressive lawyer managed to pique a particular jury's curiosity by mentioning the subject in closing argument, or that a napping prosecutor failed to raise a timely objection to that allusion. Thus, the district court appropriately scotched appellants' suggested jury instruction.

Appellants' fallback position—that the district court, if disinclined to sing the praises of jury nullification, should have refrained from giving any supplemental instruction and, instead, should have stonewalled—is not well conceived. The objection focuses on the district court's opening comment that "[f]ederal trial judges are forbidden to instruct on jury nullification," interpreting this as a judicial prohibition against the jury's use of its inherent power. The objection fails for several reasons, most noticeably because the quoted statement conveys no such chilling effect.

■ Taken literally, the judge's comment is an accurate recitation of the law and an appropriate rejoinder to the jury's question on nullification (a question that appellants prompted). The district court explained why it could not answer the jury's request for more information on nullification. The court went on to repeat its earlier instruction that if the government proved its case the jury "should" convict, while if the government failed to carry its burden the jury "must" acquit. This contrast in directives, together with the court's refusal to instruct in any detail about the doctrine of jury nullification, left pregnant the possibility that the jury could ignore the law if it so chose. Whether the jury perceived this possibility or not, no error infiltrated the court's supplemental instruction.

## IX. VARIANCE BETWEEN INDICTMENT AND PROOF

Appellants Edgar Sepulveda and Tony Rood now claim that the district court should have acquitted them because they were not part of the charged conspiracy. We review their claims to determine whether there is sufficient evidence to support the jury's verdict. *See David,* 940 F.2d at 732. We conclude that a rational jury could find, as this jury did, that a single conspiracy existed, and that the two objectors participated in it.

■ We start with bedrock. Ordinarily, questions anent the number and structure of conspiracies present matters of fact suitable for resolution by a jury. *See*

*id.; United States v. Boylan,* 898 F.2d 230, 243 (1st Cir.), *cert. denied,* 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990). Of course, the jury's inquiry is guided by certain principles. For example, in a unitary conspiracy it is not necessary that the membership remain static, *see United States v. Perholtz,* 842 F.2d 343, 364 (D.C.Cir.), *cert. denied,* 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988), or that all members join at the same time, *see United States v. Cintolo,* 818 F.2d 980, 997 (1st Cir.) (deeming that latecomers to a conspiracy adopt the prior acts and declarations of earlier arrivals), *cert. denied,* 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987), or that a given member knows all his fellow coconspirators, *see Rivera–Santiago,* 872 F.2d at 1079. Similarly, the *modus operandi* of a conspiracy may vary over time without negating the existence of a single conspiracy. *See Garcia–Rosa,* 876 F.2d at 223.

Turning to the instant case, several defendants argued that they were not members of the charged conspiracy. The district court instructed the jury that it should convict a particular defendant only if it found him or her to be part of the single conspiracy limned in the indictment. The court cautioned the jurors that they must acquit any defendant not linked to that conspiracy even if they concluded that such defendant had been a member of a separate, equally heinous conspiracy. The verdict, then, had the effect of rejecting the "multiple conspiracy" defense, instead signifying the jury's contrary conclusion that the appellants collogued together within the framework of the master conspiracy.

■ To be sure, the charged conspiracy had a protean quality—but many criminal conspiracies, particularly large conspiracies that function for extended periods of time, must adjust to cope with changing conditions. In this respect, conspiracies are like other business organizations: a conspiracy may hire, fire, retool, change suppliers, expand, downsize, refine its operating practices, undertake new marketing strategies, or shift its priorities from time to time without sacrificing its essential identity. It is, therefore, not fatal to the government's "single conspiracy" theory that David Sepulveda began his ca-

reer by patronizing a cocaine supplier in Nashua, and later switched to a source in Lawrence. Likewise, the fact that the organization's methods and tactics evolved over time did not dictate a finding of two, three, or four separate conspiracies. The government offered evidence showing that, throughout the six-year period covered by the indictment, the goals of the organization were constant, its leadership did not change, and much of its membership remained stable. These are important indicia of unitariness. *See David,* 940 F.2d at 734. All in all, we find the common threads adequate to create a jury question as to whether a single conspiracy existed.

■ The evidence tying Edgar Sepulveda to the single conspiracy is more than ample. Two witnesses testified that Edgar, himself, sold them cocaine. Four witnesses testified that Edgar routinely accompanied his brother, David, on drug-buying sprees. One of these witnesses, Norberto Perez, testified to taking an average of one such trip a week with the Sepulveda siblings over a protracted period of time. Another witness, John Rice, testified that he saw the Sepulvedas packaging cocaine at Driesse's home.

■ There is similar, albeit less pervasive, evidence of Rood's role in the organization. Perez testified that he and Rood made over fifteen trips to Lawrence in order to replenish David Sepulveda's drug inventory. When David agreed to pay Santos in kind for chauffeuring him during a drug delivery, he instructed Rood, in Santos's presence, to give Santos his stipend. On another occasion, David sent Rood and Perez to retrieve cocaine that had been abandoned during a police chase. Finally, a gaggle of witnesses, including Santos, testified that they had purchased cocaine from Rood. From this variegated proof the jury could permissibly weave a tapestry linking Rood with the master conspiracy rather than isolating him within the cloister of the self-styled "mini-conspiracy" in which he now professes to have been involved. *See Moran,* 984 F.2d at 1304; *Glenn,* 828 F.2d at 861–62.

To recapitulate, the record satisfactorily supports a multifaceted finding that the sin-

gle conspiracy charged in the indictment existed and that both Edgar Sepulveda and Tony Rood enlisted in it. Thus, no material variance existed and the district court properly refused to order acquittal.

## X. POTPOURRI

Appellants raise a number of other issues. Believing that exegetic treatment of these points would serve no useful purpose, we reject some by means of this global reference and discuss the rest in summary fashion.

### A. *Particularity of the Indictment.*

■ Two appellants challenge the particularity of the indictment as it applies to them. While we comment separately on each challenge, we first lay out the black-letter rule: in general, an indictment is sufficiently particular if it elucidates the elements of the crime, enlightens a defendant as to the nature of the charge against which she must defend, and enables her to plead double jeopardy in bar of future prosecutions for the same offense. *See Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974) (collecting cases); *see also* Fed.R.Crim.P. 7(c)(1).

1. *Arline Welch.* Defendant Arline Welch argues that, as it applies to her, the indictment transgresses the *Hamling* guidelines. The gravamen of her complaint is that the indictment neither contains the elements of the crime charged nor limns the date, time, and place of her ostensible criminal activity. We think her reading of the charging papers is colored by self-interest.

■ The grand jury indicted Welch for conspiracy to possess and distribute cocaine in violation of 21 U.S.C. § 846. To convict her, therefore, the government had to show beyond a reasonable doubt that a drug-trafficking conspiracy existed about which Welch knew and in which she voluntarily participated. *See David,* 940 F.2d at 735 (explaining elements of conspiracy under § 846); *Gomez–Pabon,* 911 F.2d at 852 (similar). The indictment specifies the law which Welch is alleged to have violated and elaborates that she, with others, "knowingly" and "intentionally" agreed to act in contravention of that law. The indictment also provides a temporal framework, asserts that Welch's residence was used as a packaging center for the drug distribution ring, and states that she worked as a "runner" and a "street-level dealer." We think this information sufficiently spelled out the crime, apprised Welch of the charge against which she had to defend, and protected her from the boggart of double jeopardy. *See Hamling,* 418 U.S. at 117, 94 S.Ct. at 2907; *Paiva,* 892 F.2d at 154. In the last analysis, indictments need not be infinitely specific.

■ 2. *Kevin Cullinane.* Defendant Kevin Cullinane also challenges the indictment's particularity. Notwithstanding the pervasive proof of his complicitous conduct adduced at trial, *see supra* Part II(B), Cullinane points out that the indictment itself only mentions him twice, asserting that he purchased cocaine from David Sepulveda and that, on one specific occasion, he distributed cocaine to another coconspirator. But the frequency with which a person is (or is not) mentioned in an indictment is an insufficient indicium of the indictment's particularity. Here, the charging papers contained considerable contextual detail. Given the indictment's general description of the conspiracy and identification of the alleged coconspirators, we find that it put Cullinane on fair notice and contained information sufficient to allow him to prepare his defense. *See Hamling,* 418 U.S. at 117, 94 S.Ct. at 2907. The drug conspiracy statute, 21 U.S.C. § 846, does not require the government to plead or prove any particular overt acts in furtherance of a charged conspiracy. *See United States v. O'Campo,* 973 F.2d 1015, 1019–20 (1st Cir.1992); *Paiva,* 892 F.2d at 155.

### B. *Bill of Particulars.*

■ The same two appellants assign error to the lower court's denial of their motions for bills of particulars. Motions for bills of particulars are seldom employed in modern federal practice. When pursued, they need be granted only if the accused, in the absence of a more detailed specification, will be disabled from preparing a defense, caught by unfair surprise at trial, or hampered in seeking the shelter of the Double

Jeopardy Clause. *See United States v. Abreu,* 952 F.2d 1458, 1469 (1st Cir.) (collecting cases), *cert. denied,* —— U.S. ——, 112 S.Ct. 1695, 118 L.Ed.2d 406 (1992). We review refusals to require such bills under an abuse-of-discretion test. *See United States v. Hallock,* 941 F.2d 36, 40 (1st Cir.1991).

 Here, both appellants enjoyed the benefits of modified open-file discovery, *i.e.,* automatic discovery that encompassed all relevant data except Jencks Act material related to witnesses not employed in law enforcement. Neither appellant convincingly relates a concrete instance of inability to prepare, untenable surprise, or other cognizable prejudice stemming from the trial court's refusal to mandate further particulars. For our part, we have been unable to discover any such instance. In the unremarkable circumstances of this case, the district court acted well within the encincture of its discretion in denying appellants' motions.

## C. *Speedy Trial.*

Arline Welch contends that the court below erred in refusing to dismiss the charges against her on the ground that too long a time intervened between indictment and trial. Her claim invokes the Speedy Trial Act, 18 U.S.C. §§ 3161–3174 (1988). The Act provides in pertinent part:

> In any case in which a plea of not guilty is entered, the trial of a defendant charged in an ... indictment ... shall commence within seventy days from the filing date ... of the ... indictment, or from the date the defendant has appeared before a judicial officer ..., whichever date last occurs.

18 U.S.C. § 3161(c)(1).

 For Speedy Trial Act purposes, time has both quantitative and qualitative dimensions. The Act's 70–day trial mandate, *see id.,* exemplifies its quantitative side. On the qualitative side, the Act excludes from the 70–day period intervals of delay that result from such events as the pendency of pretrial motions, *see* 18 U.S.C. § 3161(h)(1)(F), the presence of other defendants in the case "as

to whom the time for trial has not run and no motion for severance has been granted," *id.* at § 3161(h)(7), or continuances which serve the "ends of justice," *id.* at § 3161(h)(8)(A). Therefore, a violation of the Act occurs only if (i) a sufficient number of days elapse (the quantitative benchmark), and (ii) the days are nonexcludable (the qualitative benchmark).

 Against this background, the chronology of Welch's case is telling. Her arraignment took place on November 19, 1990, and her trial started on April 2, 1991. Quantitatively, this 134–day interval exceeds the goal set by the Speedy Trial Act. But, qualitatively, the record presents a much more excusatory picture. The bulk of the time elapsed between arraignment and trial is excludable for Speedy Trial Act purposes because pretrial motions filed by the defendants, as a group, engendered considerable delay (bringing the nonexcludable time to fewer than 35 days). Hence, the court below did not err in declining to dismiss the case under the Speedy Trial Act.[25] *See, e.g., United States v. Ramirez,* 973 F.2d 36, 37 (1st Cir.1992) (collecting cases); *United States v. Torres Lopez,* 851 F.2d 520, 526 (1st Cir.1988), *cert. denied,* 489 U.S. 1021, 109 S.Ct. 1144, 103 L.Ed.2d 204 (1989); *United States v. Anello,* 765 F.2d 253, 256–58 (1st Cir.), *cert. denied,* 474 U.S. 996, 106 S.Ct. 411, 88 L.Ed.2d 361 (1985).

## D. *David Chase's Testimony.*

At trial, David Chase testified that he regularly purchased cocaine from appellant Cullinane until, having grown dissatisfied with the quality of Cullinane's wares, he began buying directly from David Sepulveda. Cullinane argues before us, as he argued below, that Chase's testimony should have been purged because Chase did not explicitly tie Cullinane to Sepulveda. We disagree.

 The relevancy of a witness's testimony cannot be gauged in isolation. *See United States v. Hickey,* 596 F.2d 1082, 1089 (1st Cir.), *cert. denied,* 444 U.S. 853, 100

---

**25.** We note that the district court also granted an ends-of-justice continuance on December 18, 1990, in response to David Sepulveda's motion for an extension of discovery deadlines, thereby providing an additional source of excludable time. *See* 18 U.S.C. § 3161(h)(8)(A).

S.Ct. 107, 62 L.Ed.2d 70 (1979). Several witnesses other than Chase described Cullinane's dealings with Sepulveda, including his purchases of contraband and their joint participation in drug-buying excursions. Given this contextual detail, the jury could well infer that the sales to Chase were connected to the Cullinane–Sepulveda axis. In a criminal case, proof need not be explicit; juries are permitted, indeed, encouraged, to draw reasonable inferences from the facts before them. *See, e.g., Echeverri,* 982 F.2d at 679; *United States v. Ingraham,* 832 F.2d 229, 239–40 (1st Cir.1987), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988). The district court did not abuse its discretion in admitting evidence of Cullinane's sales to Chase as circumstantial evidence of Cullinane's role in the distribution network.

### E. *Steven Ranfros's Testimony.*

David Sepulveda objected to the testimony of Steven Ranfros, a police officer who recounted that Sepulveda and several of his associates chased Ranfros when they discovered him watching them from a wooded area. Sepulveda insists that Ranfros's testimony lacks any relevance.

▨ Relevance is defined in terms of probative value, *see* Fed.R.Evid. 401, and trial courts are afforded wide discretion in assessing the relevance and probative value of proffered evidence. *See United States v. Sutton,* 970 F.2d 1001, 1006 (1st Cir.1992); *United States v. Nickens,* 955 F.2d 112, 125 (1st Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 108, 121 L.Ed.2d 66 (1992). We will disturb an exercise of that discretion only upon a showing of manifest abuse. *See United States v. Yefsky,* 994 F.2d 885, 898 (1st Cir.1993). We discern no such problem here. Ranfros's testimony could be taken to bear on guilty knowledge, and, thus, the district court had discretion to allow the jury to consider it.

### F. *The Terry Stop.*

At trial, the government introduced evidence that the police seized $4,200 from David Sepulveda after a highway stop near Nashua. Sepulveda moved to suppress the evidence. The government contended that the cash constituted the fruits of a search incident to a lawful arrest. The district court denied the suppression motion without comment. Sepulveda assigns error to this ruling and to the admission of evidence emanating from the seizure.

In its appellate brief, the government concedes the fallibility of the construct that it hawked in the district court and, instead, attempts to justify the search under *Terry v. Ohio,* 392 U.S. 1, 29–30, 88 S.Ct. 1868, 1884–1885, 20 L.Ed.2d 889 (1968). At oral argument the government executed yet another about-face, acknowledging that the *Terry*-based yarn spun in its brief is easily unravelled. We do not find it surprising that the prosecution, like a Pirandello character in search of an author, has encountered insuperable difficulties in articulating a viable theory: the short of it is that the cash was unlawfully seized and that evidence derived from the seizure should have been suppressed. We do not understand why the government is unwilling simply to face that fact—or why it pressed so vigorously to have evidence obtained in a patently illegal manner admitted in the first place.

▨ At any rate, the matter is academic. As a general rule, a defendant is not shielded if the government violates someone else's constitutional rights. *See United States v. Santana,* 6 F.3d 1, 8 (1st Cir.1993). Consequently, Sepulveda's coconspirators have no standing to raise a claimed abridgment of his Fourth Amendment rights. *See United States v. Padilla,* —— U.S. ——, ——, 113 S.Ct. 1936, 1939, 123 L.Ed.2d 635 (1993); *Rawlings v. Kentucky,* 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980).

▨ As to Sepulveda himself, the erroneously admitted evidence is cumulative. In testimony not covered by the motion to suppress, a civilian witness, Michael Lacerte, related that he had given the funds in question to Sepulveda so that Sepulveda could buy cocaine. Lacerte also recounted Sepulveda's explanation as to seizure of the money. Under the circumstances, and bearing in mind the factors that frame our inquiry, *see supra* p. 1182, whatever error inhered

in admitting evidence anent the seizure and its sequelae was entirely harmless.

### G. *Jury Taint.*

At one point during the trial, a juror joked about one of the defendants. The district court proceeded to question two jurors out of earshot of the venire. After identifying the individual responsible for the wisecrack, the court dismissed her. Appellants moved unsuccessfully for a mistrial and now posit error based on the denial of their motion.

■■■■ We find nothing amiss. When a potentially taint-producing event threatens to mar the jury's integrity, the district court has fairly broad discretion in deciding whether the situation is susceptible to remediation, and if so, what corrective action might be appropriate. *See Boylan,* 898 F.2d at 258; *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 570 (1st Cir.1989). Unless the event leaves so sour a taste that less extreme palliatives will prove inadequate to undo serious damage, the mere possibility of jury taint does not necessitate a mistrial. *See United States v. Hunnewell,* 891 F.2d 955, 960–61 (1st Cir.1989). Mindful of the trial court's superior coign of vantage, we accord great respect to a district judge's finding that a jury has not been irreparably tainted. *See Boylan,* 898 F.2d at 258.

■■■■ Here, the judge employed a combination of amelioratives: he removed the offending juror from the case and issued hortatory instructions to the remaining jurors. Given what transpired, the judge's prescription seems reasonably well calculated to protect the defendants' legitimate rights; the joke, albeit tasteless, did not work a *per se* deprivation of appellants' right to a fair trial. Consequently, the court acted appropriately in refusing to abort the trial. *See Hunnewell,* 891 F.2d at 961.

### H. *Destruction of Evidence.*

On May 5, 1989, in the course of a separate investigation, the government took custody of certain telephone records belonging to defendant Cullinane. After examining the records, the government returned them to Culli-

nane's housemate. In turn, the housemate threw them out. Seizing on this development, appellant Arline Welch asseverates that those records may have contained exculpatory material vis-a-vis her relationship with Cullinane and that, therefore, the government's failure to maintain them requires dismissal of the indictment. The asseveration is full of holes.

■■■■ Government destruction of potentially exculpatory evidence only violates the rule in *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97, if the evidence possesses apparent exculpatory value that cannot fully be replicated through other sources, and if the government acts willfully or in bad faith in failing to preserve it. *See Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 337–38, 102 L.Ed.2d 281 (1988); *California v. Trombetta,* 467 U.S. 479, 488–89, 104 S.Ct. 2528, 2533–34, 81 L.Ed.2d 413 (1984); *United States v. Femia,* 9 F.3d 990, 995 (1st Cir. 1993). Government investigators typically cast a wide net and haul in a variety of items. While evidence, once seized, cannot be destroyed willy-nilly, the government does not become an insurer of the perpetual availability of every item caught in its investigatory net. *See, e.g., United States v. Kincaid,* 712 F.2d 1, 2–3 (1st Cir.1983).

■■■■ In the situation at hand, the government did not destroy the records Welch seeks but merely returned them to Cullinane's residence. There is no hint of bad faith and no indication that the agents knew, or should have anticipated, that Cullinane's friend would thereafter discard them. Accordingly, Welch's motion is best regarded as a throwaway.[26]

### I. *Cumulative Error.*

■■■■ Appellants argue that even if certain trial errors, taken in isolation, appear harmless, the accumulation of errors effectively undermines due process and demands a fresh start. We accept the theoretical underpinnings of this argument. Individual errors, insufficient in themselves to necessitate a

---

**26.** In view of this shortfall, we need not address the other prongs of the test.

new trial, may in the aggregate have a more debilitating effect. *See, e.g., United States v. Dwyer,* 843 F.2d 60, 65 (1st Cir.1988); *Dunn v. Perrin,* 570 F.2d 21, 25 (1st Cir.), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978); *cf. United States v. Samango,* 607 F.2d 877, 884 (9th Cir.1979) (employing cumulative error doctrine to invalidate results of grand jury proceeding). In other words, a column of errors may sometimes have a logarithmic effect, producing a total impact greater than the arithmetic sum of its constituent parts.

Of necessity, claims under the cumulative error doctrine are *sui generis.* A reviewing tribunal must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); and the strength of the government's case. *See, e.g., Mejia–Lozano,* 829 F.2d at 274 n. 4. The run of the trial may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial.

The cumulative error doctrine is inapposite here. While we have uncovered a few benign bevues, *e.g.,* the district court's failure to grant David Sepulveda's motion to suppress evidence of money illegally seized from him, *see supra* Part X(F), and the ill-advised admission of two statements unsupported by extrinsic evidence and, hence, ineligible for special swaddling under Fed. R.Evid. 801(d)(2)(E), *see supra* Part V(B), the errors were not portentous; they were few and far between; they possessed no special symbiotic effect; they occurred in the course of a two-month trial; and the government's case was very strong. Consequently, the errors, in the aggregate, do not come

close to achieving the critical mass necessary to cast a shadow upon the integrity of the verdict.

Considering the trial's length, complexity, and hard-fought nature, the district court's handling of it evokes our admiration. Appellants' focus on cumulative error does not change the picture. The Constitution entitles a criminal defendant to a fair trial, not to a mistake-free trial. *See Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); *United States v. Polito,* 856 F.2d 414, 418 (1st Cir. 1988). When all is said and done, the proceedings here meet this measure.

## XI. SENTENCING ISSUES

The sentencing issues raised in these appeals implicate the federal sentencing guidelines.[27] *See David,* 940 F.2d at 739 (holding that the guidelines apply to a conspiracy that "begins before the guidelines' effective date and continues after the effective date"). Six appellants (Rood, Wallace, Cullinane, Arline Welch, Edward Welch, and Johnson) challenge rulings relative to the imposition of sentence.[28] To the extent that these challenges touch upon the district court's factfinding or its evaluative judgments in applying the guidelines to the facts as found, appellate review is for clear error. *See United States v. St. Cyr,* 977 F.2d 698, 701 (1st Cir.1992). To the extent that the challenges raise "pure" questions of law or require interpretation of the guidelines, our review is plenary. *See id.*

### A. *General Principles.*

In drug-trafficking cases under the sentencing guidelines, sentences are largely quantity-driven. *See, e.g., United States v. Morillo,* 8 F.3d 864, 870 & n. 10 (1st Cir. 1993); *United States v. Garcia,* 954 F.2d 12,

**27.** Since the district court sentenced appellants on various dates in January 1992, the November 1991 version of the sentencing guidelines applies in this case. *See United States v. Harotunian,* 920 F.2d 1040, 1041–42 (1st Cir.1990) ("Barring any *ex post facto* problem, a defendant is to be punished according to the guidelines in effect at the time of sentencing."). Therefore, all references to the sentencing guidelines will be to the November 1991 edition, unless otherwise specifically indicated.

**28.** The court below sentenced appellants to assorted prison terms ranging from a high of almost twenty-two years (David Sepulveda) to a low of five years.

15 (1st Cir.1992); *United States v. Blanco,* 888 F.2d 907, 909–11 (1st Cir.1989); *see also United States v. Bradley,* 917 F.2d 601, 604 (1st Cir.1990) (describing drug quantity as "a key datum" for sentencing purposes). The drug quantity attributable to a particular defendant is derived by adding together the amounts of narcotics, actual or negotiated, bound up in the acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). However, in the context of jointly undertaken criminal activity, such as a conspiracy, a defendant is not automatically saddled with the full weight of the conspiracy's wrongdoing; rather, a defendant is responsible for drugs he personally handled or anticipated handling, and, under the relevant conduct rubric, for drugs involved in additional acts that were reasonably foreseeable by him and were committed in furtherance of the conspiracy. *See Garcia,* 954 F.2d at 15; *David,* 940 F.2d at 742; *see also* U.S.S.G. § 1B1.3(a)(1), comment. (n. 1). In this regard, we have emphasized that "the measure of a defendant's accountability for drug transactions in which he was not personally involved is usually congruent with the scope of his agreement with the other participants in the criminal enterprise." *Garcia,* 954 F.2d at 16.

### B. Tony Rood; William Wallace.

Appellants Rood and Wallace object to the district court's attribution of particular drug quantities to them. Because the same type of error infects both sentences, we discuss them in the ensemble.

In regard to Rood and Wallace, the district court's drug quantity calculations rested essentially on Perez's trial testimony.[29] According to Perez, Rood accompanied him on fifteen to twenty drug-buying jaunts and Wallace accompanied him on ten to fifteen such trips. Perez did not assign particular amounts to particular people on particular trips. Rather, he testified in sweeping generalities, stating that the smallest amount he remembered having been acquired, in the eighty or so trips he took with Sepulveda and an assortment of companions over a two-year period (1987–1989), was four ounces (113.4 grams), and the largest amount acquired was one kilogram (an amount purchased more than once). In preparing the presentence investigation report (PSI Report), the probation department adopted methods of calculation apparently urged by the prosecution. The basic method was to construct a double "average" covering both the number of runs and the amount of cocaine carried. This was done by taking the midpoint of the high and low figures and multiplying the average number of runs by the average amount carried. Thus, in Wallace's case, the PSI Report assumed twelve runs (an alleged "average" of ten and fifteen) and 556 grams per run (the rounded-off average, expressed in grams, of four ounces and one kilogram), attributing a total of 6.68 kilograms of cocaine to him. In Rood's case, a different probation officer proposed a slightly more complicated (but methodologically similar) calculation and attributed 8.3 kilograms to him. The exact mechanics are beside the point; what matters, for our purposes, is that, albeit somewhat more circuitously, the ultimate attribution of a drug quantity figure to Rood, as to Wallace, represented an assumed average number of trips multiplied by an assumed average quantity of cocaine per trip.

The district court held separate sentencing hearings for Rood and Wallace. Neither the prosecution nor the defendants offered additional evidence. The court, over objection, endorsed the probation officers' calculations, attributing 8.3 kilograms of cocaine to Rood and 7.6 kilograms to Wallace. This yielded a base offense level (BOL) of 32 for each man. *See* U.S.S.G. § 2D1.1(c)(6) (Drug Quantity Table) (establishing BOL of 32 for at least five but less than fifteen kilograms of cocaine). The court essayed further offense-level adjustments (not now in dispute), factored Rood's criminal history category (IV) into the mix, and set his guideline sentencing range (GSR) at 135–168 months. The court sentenced Rood at the bottom of the range. Wallace displayed a less notorious criminal

---

29. To be sure, there was some evidence of participation by Rood and-or Wallace in a few other incidents. But the quantities involved in these incidents were niggling in comparison to the Sepulveda trips and, thus, do not affect these appeals.

history (category II). Nonetheless, after interim adjustments not material here, his GSR proved to be identical. Relying on *United States v. Floyd*, 945 F.2d 1096, 1099 (9th Cir.1991), and citing a lack of adult guidance during Wallace's youth, the court departed downward, sentencing him to ten years.[30]

■■■ The defense's first line of attack is to assail Perez's testimony as utterly unreliable in view of his dubious character, asserted contradictions, and sundry other defects. But, the trial judge heard and saw Perez testify at trial, and credited his testimony. Such credibility calls are grist for the trial court's mill. *See St. Cyr*, 977 F.2d at 706. Consequently, we have no basis for overturning this judgment.

■■■ Nonetheless, one swallow does not a summer make. The critical problem with respect to these sentences lies not with Perez's testimony but with the pyramiding of inferences based upon it. Perez's testimony was elicited at trial, not at either sentencing hearing, and the prosecution, primarily concerned during trial with proving the defendants' participation in a drug trafficking conspiracy rather than fixing the precise quantity of drugs for which each defendant might be held responsible, obtained a bare minimum of information. With no better information at hand, these appellants' sentences cannot be upheld.

■■■ For sentencing purposes, the government must prove drug quantities by a preponderance of the evidence. *See United States v. Sklar*, 920 F.2d 107, 112–13 (1st Cir.1990); *Bradley*, 917 F.2d at 605. Courts must sedulously enforce that quantum-of-proof rule, for, under the guidelines, drug quantity has a dramatic leveraging effect. Thus, relatively small quantitative differences may produce markedly different periods of immurement. This reality informs the preponderance standard, requiring that district courts must base their findings on "reliable information" and, where uncertainty reigns, must "err on the side of caution."

*Sklar*, 920 F.2d at 113 (quoting *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir.), *cert. denied*, 498 U.S. 990, 111 S.Ct. 532, 112 L.Ed.2d 542 (1990)).

These tenets possess particular force on the record before us, for we do not believe that the so-called average figures selected by the probation officers and adopted by the trial court have adequate support in the record. To say that the minimum amount carried on a single trip was four ounces and that the maximum was one kilogram provides no rational basis for presuming that the average amount carried on a given number of trips was the mathematical midpoint between the high and low figures. *Cf. United States v. Hewitt*, 942 F.2d 1270, 1274 (8th Cir.1991) (condemning use of a "far reaching" averaging assumptions in estimating drug quantity). Similarly, while the distortions are mathematically less serious, the selection of a midpoint in estimating the number of trips is also without evidentiary support. And the two flawed findings feed on each other; by using not one, but two, unsupported averages to arrive at both the number of trips undertaken and the amounts of cocaine handled in the course of each trip, the court compounded the error of its ways. This is, after all, not a case in which a witness testified that, in his or her estimation, "X" equalled the average drug quantity involved in a specific number of drug transactions. That kind of estimate from a lay witness may itself be troublesome, but at least the witness can be cross-examined on the figure; and this court has sometimes accepted such estimates in the past. *See, e.g., United States v. Innamorati*, 996 F.2d 456, 490 (1st Cir.), *cert. denied*, —— U.S. ——, ——, 114 S.Ct. 409, 459, 126 L.Ed.2d 356 (1993). It is also not a case where a witness has given a range, as to amounts or as to trips, but other persuasive evidence (*e.g.,* documents or records) exists tending to show that some figure within the range is supported by a preponderance of the evidence. Here, to the contrary, the court did not cite, and the PSI Report did not identify, any extrinsic evidence or other cir-

---

**30.** *Floyd* has since been overruled, albeit on other grounds. *See United States v. Atkinson*, 990 F.2d 501 (9th Cir.1993). However, the government has not prosecuted a cross-appeal and the validity of the departure decision is not before us.

cumstances making averaging peculiarly appropriate or suggesting a basis, apart from averaging, on which the probation officers' determinations might rest. For our part, we have combed the record and unearthed nothing that remotely suggests Wallace joined in transporting shipments averaging 556 grams or that Rood's shipments averaged twelve to sixteen ounces. In the face of timely objection, wholly conclusory findings such as are now before us cannot be said to command a preponderance of the evidence, and, therefore, cannot support an imposed sentence. *Cf., e.g., United States v. Shonubi,* 998 F.2d 84, 89–90 (2d Cir.1993) (vacating, in the absence of other evidentiary support, district court's drug quantity finding arrived at by rote multiplication of number of trips times quantity carried on one such trip); *United States v. Garcia,* 994 F.2d 1499, 1509 (10th Cir.1993) (vacating defendant's sentence and holding that averages, when used to arrive at drug quantity findings, must be "more than a guess"). And the gap in proof is not satisfied by showing, as the government seeks to do in its brief, that more trips and larger amounts are consistent with the general scale of the Sepulveda enterprise.

■ Let us be perfectly clear. We do not announce a *per se* rule barring a court from sentencing at a point different than the low end of a testified range. There may be other evidence in the case, direct or circumstantial, making it more likely than not that the low point is simply too low and that some other point is more probably representative. Indeed, in some situations, the estimate itself, and the contextual detail surrounding it, may provide the needed enlightenment. In our view, a sentencing court remains free to make judicious use of properly constructed averages and, ultimately, to make any finding that the record supports. *See United States*

*v. Miele,* 989 F.2d 659, 664–65 (3d Cir.1993) (explaining that, where there is other evidence tending to buttress the high end of an estimated range, the sentencing court need not restrict itself to the range's low end); *see also* U.S.S.G. § 6A1.3(a) (stating that the information on which a sentence is based must possess "sufficient indicia of reliability to support its probable accuracy"). Here, however, the record does not justify the district court's findings concerning the drug quantities it attributed to Rood and Wallace. Accordingly, because drug quantity dictated these appellants' offense levels and at least arguably influenced their sentences, Rood and Wallace are entitled to be resentenced.[31]

### C. Kevin Cullinane.

After all relevant adjustments had been made, the court below established a GSR of 121–151 months referable to appellant Cullinane,[32] and sentenced him at the range's nadir. This determination rested in substantial part on the court's drug quantity assessment. Cullinane challenges this assessment, insisting that Judge Devine erred in ascribing 8.99 kilograms of cocaine to him.

■ Our review of Cullinane's challenge is more circumscribed than might appear at first blush. It is unnecessary to address an allegedly erroneous sentencing computation if, and to the extent that, correcting it will not change the applicable offense level or otherwise influence the defendant's GSR (and, ultimately, his sentence). *See United States v. Connell,* 960 F.2d 191, 198 n. 11 (1st Cir.1992); *Bradley,* 917 F.2d at 604; *see also Williams v. United States,* — U.S. —, —, 112 S.Ct. 1112, 1121, 117 L.Ed.2d 341 (1992) (stating that an error in sentencing is harmless, and may be disregarded, if it "did not affect the district court's selection of the

---

**31.** On remand, the district court is, of course, free to hear new evidence bearing on drug quantity. For example, it may well be that better evidence can be adduced by recalling Perez or by calling other witnesses. Alternatively, the government has the "low point" estimates as to both the number of trips and amounts transported to fall back upon—and it has some specific evidence as to other transactions. To start a minitrial on drug quantity is surely a discouraging supplement to a lengthy trial; but too much rides

on the computations to rely upon the kind of drug quantity calculations that the government urges in respect to these two appellants.

**32.** We do not dissect the interim adjustments made by the district court en route to the GSR as Cullinane concentrates his fire on the drug quantity finding. We follow this same pattern, whenever applicable, in discussing other appellants' sentences.

sentence imposed"). This principle is pertinent in Cullinane's case: his BOL, and, thus, his sentence, will remain unchanged so long as he is responsible for an amount of cocaine between five and fifteen kilograms. *See* U.S.S.G. § 2D1.1(c)(6) (Drug Quantity Table). His appeal fails, then, if there is record support for ascribing at least five kilograms of cocaine to him.

■ We find this to be the case. Although the district court relied on the testimony of a number of witnesses to buttress the drug quantity it attributed to Cullinane, we need not go beyond the testimony of David Chase. Chase stated that he bought somewhere between five and eight kilograms of cocaine from Cullinane. The district court found this testimony credible and we, therefore, give it weight. At sentencing, credibility determinations are the province of the district court. *See United States v. Brewster*, 1 F.3d 51, 55 (1st Cir.1993); *St. Cyr*, 977 F.2d at 706; *see also* 18 U.S.C. § 3742(e) (1988). That ends the matter: the lowest of Chase's estimates affords a sufficient predicate for the disputed sentence.

■ Cullinane attempts to confess and avoid. Even if Chase's testimony is reliable, he ruminates, the conduct Chase describes is irrelevant to the charged conspiracy. This maneuver takes appellant down a blind alley. Within broad limits, reviewing courts must defer to a sentencing judge's determination of relevant conduct. Such findings are almost invariably factbound, and we will set them aside only if they are shown to be clearly erroneous. *See Garcia*, 954 F.2d at 16; *Bradley*, 917 F.2d at 605. In addition, the argument for deference peaks when the sentencing judge has presided over a lengthy trial and is steeped in the facts of the case. *See, e.g., United States v. Shattuck*, 961 F.2d 1012, 1014–15 (1st Cir.1992); *United States v. Zuleta–Alvarez*, 922 F.2d 33, 37 (1st Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2039, 114 L.Ed.2d 123 (1991).

These salutary precepts are dispositive here. Full deference is due and Chase's testimony, though circumstantial, touched upon, and could logically be found to involve, matters coming within the scope of the conspiracy. Accordingly, the lower court did not commit clear error in concluding that Cullinane's transactions with Chase comprised relevant conduct for sentencing purposes.

### D. *Arline Welch.*

■ The district court attributed 1924 grams of cocaine to Arline Welch and imposed the mandatory minimum incarcerative sentence under 21 U.S.C. § 841(b)(1)(B), *viz.*, five years. Welch contests only the district court's drug quantity assessment. Because the mandatory minimum applies so long as quantities of cocaine totalling 500 grams or more are involved in the offense of conviction, *see id.*, we need only inquire whether that much contraband can fairly be attributed to her.

We answer this query affirmatively. Perez testified that Arline Welch accompanied him on three journeys to Lawrence and that 10 ounces of cocaine were acquired on each trip. The district court credited Perez's testimony, attributing nearly 900 grams of cocaine to Arline Welch on this account. We decline appellant's invitation to second-guess this finding.

### E. *Edward Welch.*

The district court attributed 7.72 kilograms of cocaine to Edward Welch and, after various interim adjustments, sentenced him to 135 months in prison (the low end of the GSR). Welch challenges only the drug quantity assessment.

■ The court's attribution of cocaine to Edward Welch rests upon a cornucopia of testimony. It would serve no useful purpose to survey it all. Upon careful review of the record, we can see, at a minimum, no clear error in the court's decision to accept the testimony of Coriaty and Milne—testimony that was, in itself, sufficient to support the attribution of over 5.3 kilograms to this defendant.[33] At this point, Welch's ground of

---

**33.** At the risk of carrying coal to Newcastle, we note that Edward Welch was a fellow traveller on, and a co-venturer in, several drug-buying expeditions described *supra* Part XI(D). Thus, the drug quantities associated with those jaunts are also attributable to him.

appeal collapses, for his sentence would be the same if the court had found 5.3 kilograms rather than 7.72 kilograms. *See* U.S.S.G. § 2D1.1(c)(6). (Drug Quantity Table).

### F. *Cheryl Johnson.*

■■■ The lower court attributed 1.2 kilograms of cocaine to Cheryl Johnson and imposed the mandatory minimum five-year sentence. *See* 21 U.S.C. § 841(b)(1)(B). Johnson disputes the drug quantity finding. Here, again, the trigger amount is 500 grams of cocaine. *See id.*

The district court determined, *inter alia,* that Johnson sold 1/16th of an ounce of cocaine to Santos on at least 100 occasions; and that she sold 3/10s of an ounce to officer Malone on another occasion. The court further found that $7,115 seized from Johnson's house constituted the proceeds of drug sales and, for sentencing purposes, equated this cash stash with 5.08 ounces of cocaine. Finally, the court credited Perez's testimony that Johnson participated in at least "a couple" of drug-buying expeditions. Erring on the side of caution, the court could warrantably have found Johnson responsible for two trips, involving four ounces per trip.[34] In the aggregate, the determinations listed above support the attribution of 556 grams of cocaine to Johnson—more than the minimum required to underbrace the sentence she received.

Johnson argues against these serial findings on three grounds. Her first attack—a broadside blast aimed at the total quantity of cocaine attributed to her—deserves little comment. We simply restate the obvious: the district court's credibility calls are beyond reproach and, therefore, its bottom-line conclusion is not clearly erroneous.

■■■ Johnson's second fusillade is aimed at the cash equivalency finding. In drawing a head on the sentencing court's decision to translate dollars into drugs, Johnson is shooting blanks. The government presented abundant evidence of Johnson's narcotics trafficking, *see supra* Part II(D), and the

volume of business transacted justified the court's illation that the sums seized were connected to her drug dealings. When it is reasonably probable that confiscated cash represents either drug profits or money dedicated to the upcoming purchase of contraband, a sentencing court may convert the cash into equivalent amounts of narcotics for "relevant conduct" purposes. *See* U.S.S.G. § 2D1.4, comment. (n. 2) (authorizing district courts to use price as a means of approximating drug quantity); *see also United States v. Jackson,* 3 F.3d 506, 510 (1st Cir.1993); *United States v. Figueroa,* 976 F.2d 1446, 1460–61 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1346, 122 L.Ed.2d 728 (1993); *United States v. Gerante,* 891 F.2d 364, 369 (1st Cir.1989). So it is here.

■■■ Johnson's third salvo also flies wide of the target. She insists that the cash did not belong to her and, thus, cannot figure in her sentence. But as we read the record, the circumstantial evidence supports a finding of proprietary interest. And, moreover, even if we were to give credence to Johnson's protest regarding ownership, the cash equivalency evidence could be used against her as long as the drug money constituted part of the same common scheme or plan and met the foreseeability requirement for relevant conduct under the guidelines. *See Garcia,* 954 F.2d at 15; *Blanco,* 888 F.2d at 910–11; *see also supra* Part XI(A) (discussing relevant conduct in conspiracy cases). The evidence here could reasonably be interpreted as placing the cash stash within the orbit of the conspiracy. For these reasons, we detect no clear error in the lower court's conclusion that the money ought properly to be treated as a proxy for cocaine and counted against this appellant.

Johnson has two final items in her asseverational array. She asserts that the court should have reduced her BOL by two levels since she was merely a minor participant in the drug distribution scheme, *see* U.S.S.G. § 3B1.2(b), and that the court should have departed downward due to her family cir-

---

34. The court actually found that Johnson's two trips involved 16 ounces per trip. But, this finding utilized an impermissible process of rote

averaging. *See supra* Part XI(B). Hence, we use the low end of the range of available estimates for purposes of appellate review.

cumstances. Neither assertion has much firepower.

As to the former plaint, a role-in-the-offense reduction, even if granted, would have no effect on appellant's sentence due to the overriding force of the mandatory minimum prescribed by 21 U.S.C. § 841(b)(1)(B). *See* U.S.S.G. § 5G1.1(b) (providing that the statutorily required minimum sentence shall be the guideline sentence when it exceeds the top of the applicable GSR). The assignment of error is, therefore, moot.

 As to Johnson's last point, it is settled in this circuit that a sentencing judge's informed decision not to depart, regardless of direction, is a non-appealable event. *See United States v. Tardiff,* 969 F.2d 1283, 1290 (1st Cir.1992); *United States v. Hilton,* 946 F.2d 955, 957 (1st Cir.1991). There is nothing about appellant's case that extricates it from the vice-like grip of this jurisdictional rule. In any event, appellant failed to seek a departure below and, hence, cannot broach the matter for the first time on appeal. *See Ortiz,* 966 F.2d at 717 (reiterating rule that appellate court will not address sentencing arguments that were not seasonably advanced below); *United States v. Dietz,* 950 F.2d 50, 55 (1st Cir.1991) (similar).

## XII. CONCLUSION

We need go no further. After considering all the issues raised by appellants, including some issues not specifically discussed herein, we have unearthed no vestige of reversible error. Appellants' convictions and sentences are therefore lawful, save only for the sentences imposed on Rood and Wallace. Accordingly, we affirm the convictions of those two appellants, vacate their sentences, and remand for resentencing. At the same time, we affirm the convictions and sentences of the other eight appellants. We stay issuance of mandate in all the appeals, pending publication of the two additional (and closely related) opinions described *supra* note 2.

*The convictions and sentences of appellants David Sepulveda, Edgar Sepulveda, Edward W. Welch, Jr., Arline S. Welch, Kevin Cullinane, Cheryl T. Johnson, Rich-* *ard F. Labrie, and Ernest F. Langlois are affirmed in all respects. The convictions of appellants Tony Rood and William D. Wallace are affirmed, their sentences are vacated, and, as to those appellants only, the case is remanded for resentencing. The issuance of mandate is stayed pending further order of the court.*